COMMONWEALTH vs. DENISE WHITEHEAD
(and three companion cases [1]).

Norfolk.   October 3, 1979. — January 30, 1980.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Jury and Jurors.  Practice, Criminal,* Challenge of jurors, Instructions to
  jury, Assistance of counsel, Sentence.  *Pleading, Criminal,* Indict-
  ment, Bill of particulars.  *Rape.  Joint Venture.  Robbery.  Witness,*
  Competency.  *Evidence,* Statement of codefendant, Photograph, Prior
  conviction.

A female defendant was not denied her right to a fair and impartial jury
    by the fact that her codefendant used ten of her peremptory challenges
    to exclude eight women and two men and the jury, as sworn, consisted
    of fourteen men where she did not raise any objection at trial to her co-
    defendant's use of her peremptory challenges.  [645-646]
At the trial of indictments charging two female codefendants with rape,
    the judge did not err in refusing to exclude from jury consideration the
    theory of guilt of rape through female-to-female intercourse where the
    defendants were put on notice by the indictments, bill of particulars,
    and the prosecutor's opening argument that the Commonwealth in-
    tended to proceed on both that theory and a theory of male-to-female
    rape through joint venture with their male companions.  [646-650]
At a criminal trial, there was no error in the judge's instructions on joint
    venture.  [650-652]
At the trial of indictments charging the defendants with rape and rob-
    bery, the judge did not err in granting the defendants' motions for
    directed verdicts only as to the charges of robbery while armed and de-
    nying the rest.  [652-655]
At a criminal trial, the judge did not abuse his discretion in finding the
    victim competent to testify to details of the crime.  [655-657]
There was no support in the record of a criminal trial for the defendant's
    claim that she was denied the effective assistance of counsel.  [657-658]
At a criminal trial, there was no error in admitting statements made by
    two codefendants in a joint interview.  [659]
At a criminal trial, there was no error in admitting in evidence mug shot
    photographs of the defendants.  [659-660]

[1] Two against Mary K. Connolly and one against Denise Whitehead.

At a criminal trial, the judge did not abuse his discretion in refusing to
strike the victim's testimony as to certain remarks made by the defend-
ant which the victim had not mentioned in any statement she had
given previously. [660]

At the trial of two defendants, one of the defendants was not prejudiced
by the judge's refusal to instruct the jury at the close of her case that
she was not to be affected by evidence presented by the other defend-
ant where the judge gave limiting instruction as part of his charge to
the jury. [660-661]

At a criminal trial, the prosecutor's use of prior convictions to impeach
the defendant was authorized by G. L. c. 233, § 21, and the right to a
limiting instruction was forfeited by the defendant's omission to ask
for it. [661-662]

At a criminal trial, the two defendants were not prejudiced by the judge's
reference to their lesbianism. [662]

A judge did not err in denying a new trial to a defendant on the basis of
the victim's testimony at a subsequent trial of other defendants on the
same charges. [662-663]

There was no merit to a defendant's contention that the judge improperly
sentenced her for a crime of which she was acquitted. [663-664]

INDICTMENTS found and returned in the Superior Court
on November 10, 1977.

The cases were tried before *Chmielinski,* J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

*Martin S. Cosgrove* for Denise Whitehead.

*Nancy Gertner* for Mary K. Connolly.

*Charles J. Hely,* Assistant District Attorney, for the Com-
monwealth.

KAPLAN, J. The defendants Denise Whitehead and Mary
K. Connolly were each indicted for rape, armed robbery,
armed assault with intent to murder, and assault and bat-
tery by means of a dangerous weapon. Upon joint trial,
they were convicted of rape, unarmed robbery (the judge
having directed verdicts of not guilty on the balance of the
robbery indictments), and assault and battery (as lesser in-
cluded offenses on the indictments for the aggravated as-
saults). The assault and battery convictions of each were

placed on file by consent. These are appeals pursuant to
G. L. c. 278, §§ 33A-33G, from the two main convictions of
each defendant on which concurrent life sentences were im-
posed, and from the denial of each defendant's motion for a
new trial. Numerous errors are claimed. We conclude that
the convictions should stand. Also we find no legal error in
the sentences challenged by one of the defendants. (Of
course the terms of the sentences are subject to review in the
usual course by the Appellate Division of the Superior
Court.)

A. *Narrative.* Principal witnesses for the prosecution
were Carl McQuade and Miss M. (the victim); in addition
the prosecution offered the substance of a joint interview of
the defendants by Quincy police officers, and related testi-
mony. The defendants testified on their own behalf. From
all the proofs the jury could have found the following.
Sometime on Friday afternoon, October 14, 1977, the vic-
tim, aged eighteen, travelled from the Roslindale apartment
she occupied with her father to their former apartment on
Beacon Street, Boston. After retrieving some letters that
had arrived there, she started walking in the direction of the
"Combat Zone." She was carrying about $60, a red pocket
knife, and an identification card. Happening to meet John
James, with whom she was slightly acquainted, she went
with him to a lounge on Tremont Street. This was some-
time after dark.

She was introduced at the lounge to Gary Moody, Carl
McQuade, and the two defendants. The four were known
to each other; the defendants were lovers. The defendant
Connolly had met James previously; only James had known
the victim. The victim spent most of the evening playing
pool with McQuade, Moody, and Whitehead. Apparently
there was heavy drinking by Moody and considerable by
McQuade and Connolly. At some point during the evening
James told the defendants that the victim had $300 and "we
could go partying."

When the lounge closed around 2 A.M., the group of six
left together. Marihuana was wanting. Whitehead fetched

her car, and the rest got in. Whitehead was driving, Connolly in the front passenger seat, the three men in the back section with the victim. The car stopped at a place on Hemenway Street where Whitehead thought they might buy marihuana. Whitehead asked for money and James handed her $10 which the victim gave him voluntarily. Whitehead entered the building but returned a few minutes later without the goods. In lieu of the drug, Connolly shared with the others a six-pack of beer she had in the car.

Now the car proceeded to a gas station near Brookline Village. Whitehead bought gas with the $10 earlier contributed by the victim. The defendants got out of the car to go to the washroom; on their return they said they saw the victim playing with McQuade's and Moody's penises and kissing James. Connolly had heard McQuade and Moody telling the victim they wanted intercourse with her, and on returning to the car the defendants found Moody saying he had won a bet when playing pool with the victim and wanted to collect the sex he had earned. He asked Whitehead to drive to a good place and Whitehead chose Franklin Park.

On the way violence broke out in the back seat. Connolly heard the victim being struck by one or two of the men. At Franklin Park, McQuade and Moody left the car with the victim; they returned shortly when a car nearby disturbed their plan. By this time the victim's pants were off. As they left the park, McQuade was sitting in the front seat and Connolly was on the console which separated that seat from the driver's.

As the car proceeded to Columbia Point, the victim was beaten again. Refusing McQuade's demand for intercourse, she was forced to commit fellatio on him. Then she was stripped by the men of her remaining clothes. McQuade or James pushed the struggling victim onto Moody who forced intercourse on her. In the process the victim was struck on the face and was given her shirt to use as a compress against her bleeding nose.

At Columbia Point the car stopped and McQuade left to relieve himself. At this point, apparently, Whitehead watched Moody have another round of forced intercourse with the victim. Naked, the victim was passed by Moody and James to the front seat where the defendants in turn committed cunnilingus on her. The defendants then passed the victim back to the men.

McQuade returned to the front passenger seat. As the car departed Columbia Point, Moody demanded the victim's money. She said she had none. Connolly reached back from her perch on the console and said, "Where's your money, bitch?" and "Give up the money." Moody punched the victim in the face. Connolly took or was passed $38 from the pocket of the victim's pants and at Whitehead's suggestion she put the money on the dashboard. Moody continued to talk money — James had promised $300 at the lounge — but then demanded fellatio and the victim complied.

Whitehead was driving without a set destination, but as the car became overheated she began to look for an all-night gas station. She knew one in Quincy and headed the car there. At some point she stopped at an all-night diner and left the car to ask directions. The victim was pushed to the floor in the back of the car by Moody, McQuade, and James and held in that position. Moody said he "had to get rid of her." At this time, too, Connolly said, "Shut up, bitch, I'll kill you." Whitehead, returning, added, "She knows us. You have to kill the lousy white trash." The car then headed toward the gas station but was diverted when McQuade spotted the entrance to Mount Wollaston cemetery. Whitehead drove in and stopped at Moody's request.

Moody and McQuade were wielding knives and Moody said, "I have to get rid of her." Whitehead: "Get her out of the car." Moody and McQuade dragged the victim into the cemetery behind the car. McQuade kicked the victim to the ground and Moody, using the victim's red pocket knife, slit her throat. Meanwhile James used the victim's clothes to try to wipe her blood from the interior of the car, then tossed

them out the window.  Connolly saw that Moody's shirt was covered with blood when he and McQuade returned to the car, and she exclaimed, "My God, what did you do?", and Moody said he had stabbed the victim in the throat.  He told them all to shut up and not to talk of the incident.

As Whitehead turned the car around to leave, Moody told Whitehead to stop.  Moody left the car with McQuade.  Approaching the victim lying on the ground, they kicked her "numerous" times with the others watching.  They returned to the car.  Moody repeated threateningly that all should keep quiet.  They stopped at a gas station, and there was an effort to wipe off more of the blood with paper towels.  Marihuana not previously disclosed was produced and used.

Whitehead drove back to Boston dropping Moody and McQuade on Beacon Hill and James on Cambridge Street.  The time was now after 3:30 A.M.  Whitehead with Connolly drove to Brockton.

Somehow the victim survived the attack in the cemetery and stumbled to a house nearby and was found by the occupant.  She was taken to Quincy Hospital and released some five and a half weeks later.

B. *Main Contentions.* 1. *Composition of the jury.* Whitehead seeks to invalidate the entire trial as to herself by invoking the principle of our recent decision of *Commonwealth v. Soares,* 377 Mass. 461 (1979), which — speaking generally — proscribes the use of peremptory challenges to exclude prospective jurors solely by reason of their sex, race, color, creed, or national origin.  Whitehead points out that her codefendant Connolly used ten of her fourteen peremptories to exclude eight women and two men (whereas Whitehead struck six men and the Commonwealth three men).  In the end, the jury with alternates, as sworn, consisted of fourteen men.  The present record on appeal is missing many data potentially relevant on such a claim — for example, the number and composition of the venire — but we are content to make the assumption for the present purpose that Connolly used her challenges in such a way that,

under the *Soares* principle,. the prosecution could properly have objected at the time of jury selection; for *Soares* teaches that the vice may be attacked as well by the Commonwealth when the defense offends, as by the defense when the Commonwealth is at fault. *Id.* at 489 n.35.

Whitehead's argument, however, is quite inapposite. *Soares* does indeed state that its rule "applies . . . to the defendants in all cases pending on direct appeal [on March 8, 1979, the date of the decision] where the record is adequate to raise the issue." *Id.* at 493 n.38. The present case was on direct appeal at the time, but it would be a perverse misuse of the doctrine to apply it to throw over Whitehead's trial. Connolly could not and does not claim she was tried by an unconstitutional jury because (according to the assumption) she was responsible for its skewed membership and sought thereby a strategic advantage, absence of women on the jury who would (as Connolly might think) react with particular abhorrence to the defendants' abuse of the female victim. No more should Whitehead be permitted to make the claim, when she uttered no protest of any sort[2] to the trial judge in the face of her codefendant's use of peremptories that would yield her, Whitehead, the same supposed advantage.

2. *Female-to-female rape under indictments and particulars.* As part of their submission on their motions for directed verdicts at the close of the prosecution's case, the defendants argued that the theory of guilt of rape through female-to-female intercourse must be excluded from consideration. The judge did not accept the contention and later, over like argument, instructed the jury that they might find the defendants guilty of rape, if proved, either

---

[2]It will be noted that in the recent case of *Commonwealth* v. *Walker*, ·-*ante* 297, 300 (1979), the defendant, qualifying under footnote 38 of the *Soares* opinion, had not remained silent but had noted for the trial record (although without a formal exception) the misuse of peremptory challenges (further facts were brought out on a motion for a new trial); and the misuse was by the prosecutor, not a codefendant.

for male-to-female rape through joint venture with the male actors, or female-to-female rape, or both. The defendants now reassert their contention and say that to allow conviction on the second alternative comprehends a variance prohibited under G. L. c. 277, § 35,[3] or is otherwise illegal.

While the legal questions argued are not completely clear, we do not think the judge erred. The first point to be made is that the defendants as a practical matter were put on notice that the female-to-female encounters were a phase of the case the Commonwealth proposed to prove. The prosecutor in his opening argument described the episodes in the front as well as the rear of the car. There was no reaction from the defendants. Proof of those episodes was then offered by the Commonwealth, again without objection from the defendants, and the defendants cross-examined on it. In point of fact, the Commonwealth had tendered to the defendants before trial two statements of the victim referring to these acts of cunnilingus.

There cannot be any persuasive contention here that the defendants were surprised by a development at trial. Still it remained possible for the defendants to argue that female-to-female rape did not fit under the indictment taken together with any proper bill of particulars. See *Commonwealth* v. *Albert*, 307 Mass. 239, 244 (1940); *Commonwealth* v. *Stone*, 300 Mass. 160, 164-165 (1938); *Commonwealth* v. *Snow*, 269 Mass 598 (1930); art. 12 of the Declaration of Rights of the Commonwealth of Massachusetts. Cf. *Stirone* v. *United States*, 361 U.S. 212, 217-218 (1960); *Gaither* v. *United States*, 413 F.2d 1061 (D.C. Cir. 1969). The indictments returned here charged, under G. L. c. 265,

---

[3] General Laws c. 277, § 35, reads: "A defendant shall not be acquitted on the ground of variance between the allegations and proof if the essential elements of the crime are correctly stated, unless he is thereby prejudiced in his defence. He shall not be acquitted by reason of an immaterial misnomer of a third party, an immaterial mistake in the description of property or the ownership thereof, failure to prove unnecessary allegations in the description of the crime or any other immaterial mistake in the indictment."

§ 22,[4] that each defendant "did have sexual intercourse with [the victim] the said [defendant] having compelled the said [victim] to submit to such sexual intercourse by force and by threat of bodily injury, against her will." It is argued that by using the expression "sexual intercourse" the prosecution limited itself to male-to-female intercourse of the "natural" type, and "sexual intercourse" may indeed carry that meaning in distinction from "unnatural sexual intercourse." See *Commonwealth* v. *Gallant*, 373 Mass. 577, 584 (1977). The words "sexual intercourse" as appearing in the indictments thus suggested a theory of joint venture with the males in "common law" rapes. But when the indictments alleged that the defendants "did have sexual intercourse with" the victim, and all were females, it would take no strained imagination to find embodied a charge of sexual assault female-to-female. A bill of particulars could not be given the effect of adding a fresh charge to the indictment, *Commonwealth* v. *Ries*, 337 Mass. 565, 580 (1958), but it could serve to clarify what was instinct in it. *Commonwealth* v. *Valleca*, 358 Mass. 242, 244 (1970); *Commonwealth* v. *Hayes*, 311 Mass. 21, 25 (1942). See also G. L. c. 277, §§ 34, 40.[5] Here the bill furnished by the prosecution set out

---

[4] General Laws c. 265, § 22, as amended by St. 1974, c. 474, § 1, provides: "Whoever has sexual intercourse or unnatural sexual intercourse with a person, and compels such person to submit by force and against his will, or compels such person to submit by threat of bodily injury, shall be punished by imprisonment in the state prison for life or for any term of years."

[5] General Laws c. 277, § 34, provides: "An indictment shall not be quashed or be considered defective or insufficient if it is sufficient to enable the defendant to understand the charge and to prepare his defence; nor shall it be considered defective or insufficient for lack of any description or information which might be obtained by requiring a bill of particulars under section forty."

Section 40 is as follows: "The court may, upon arraignment of the defendant, or at any later stage of the proceedings, order the prosecution to file a statement of such particulars as may be necessary to give the defendant and the court reasonable knowledge of the nature and grounds of the crime charged, and if it has final jurisdiction of the crime, shall so order at

for each indictment that "[t]he defendant individually and in concert with others compelled [the victim] to submit to sexual intercourse." This can be reasonably read to point to the dual theories, and if ambiguity persisted, the defendants could have applied for a further bill. *Commonwealth* v. *Benjamin*, 358 Mass. 672, 676 n.6 (1971).[6]

We should add that, although the defendants had the grand jury minutes in their possession since pretrial, it was only after the close of all the evidence that they drew to the judge's attention that no evidence had been offered to the grand jury of female-to-female rape. If the indictment or any part of it could be attacked for absence of proof before the grand jury (a question discussed and left open in *Commonwealth* v. *St.Pierre*, 377 Mass. 650, 654-657 [1979]), that had to be done with dispatch and surely as soon as the possibility arose that dual theories would be pursued. Notice of this emerged from the bill of particulars if not from the indictment itself.

Taking the whole situation into account, we do not see a convincing basis for relieving the defendants of the verdict of guilty of rape.[7] As indicated, there was no showing of prejudice in the sense of any mystification of the defendants

---

the request of the defendant if the charge would not be otherwise fully, plainly, substantially and formally set out. If there is a material variance between the evidence and the bill of particulars, the court may order the bill of particulars to be amended, and may postpone the trial, which may be before the same or another jury, as the court may order. If, to prepare for his defence, the defendant desires information as to the time and place of the alleged crime or the means by which it is alleged to have been committed, or more specific information as to the exact nature of the property described as money, or, if indicted for larceny, as to the crime which he is alleged to have committed, he may apply for a bill of particulars as aforesaid."

[6] Since the theories could reasonably be perceived, and the case was submitted to the jury accordingly, the case is remote from *Commonwealth* v. *Edelin*, 371 Mass. 497, 520 (1976), where three Justices saw a "prejudicial shift from the accusation as specified by the Commonwealth to the crime as defined in the judge's instructions."

[7] That would be the result, for under the instructions the jury may have found the defendants guilty of the female-to-female rapes but not of the other rapes.

at trial, and there is no double jeopardy problem here since the rape convictions on the present record would foreclose any new prosecution on either theory. *Kuklis* v. *Commonwealth,* 361 Mass. 302, 306-307 (1972).[8]

3. *Instructions on joint venture.* No objection was taken nor is any claim now made about those instructions which defined the various substantive offenses. But there is argument about the instructions on joint venture. A proper charge on that subject comprises the element of the abettor's sharing (it may be in a conditional sense) the mental state or intent of the main actor, and the element of actual participation by the abettor. See *Commonwealth* v. *Scanlon,* 373 Mass. 11, 17 (1977); *Commonwealth* v. *Ambers,* 370 Mass. 835, 839 (1976); *Commonwealth* v. *Richards,* 363 Mass. 299, 307-308 (1973); *Commonwealth* v. *Chinn,* 6 Mass. App. Ct. 714, 716 (1978). Both defendants assign error in the judge's failure to give Whitehead's proposed instruction No. 19 as to the level of participation required. On that element, a charge should "emphasiz[e] the requirements of active participation in a common design, . . . leaving the elements as factual questions for the jury." *Commonwealth* v. *Blow,* 370 Mass. 401, 407 (1976). We think the charge given conformed well enough. The judge said: "In order to support a conviction on the theory of joint enterprise, the Commonwealth must show that the defendants associated themselves with a criminal venture and participated in the commission of the offense to some extent." Then he said (quoting from *Commonwealth* v. *Morrow,* 363 Mass. 601, 609 [1973]): Thus, "[o]ne who is present during the commission of a crime, assents to it, and by arrangement is in a situation where he might render some aid to the perpetra-

---

[8] On the entire point here discussed, it is not without importance that the crimes of forced sexual intercourse and forced unnatural sexual intercourse now fall within the single comprehensive statutory prohibition of rape set out in G. L. c. 265, § 22, as enacted in 1974; see also the "meaning" of "rape" as defined in G. L. c. 277, § 39, enacted at the same time. An indictment charging simply "rape" is adequate to cover both varieties of sexual assault. See now G. L. c. 277, § 79; *Commonwealth* v. *Manning,* 6 Mass. App. Ct. 430, 434-435 (1978).

tor, is a principal." This drew in some degree on cases which hold responsible a person who, although not assisting directly in the commission of a crime, takes up a position "as a lookout to give warning, or as a decoy to beguile the police and others from possible suspicions, or as an ally in making escape or in meeting any eventuality." *Commonwealth* v. *Conroy,* 333 Mass. 751, 755 (1956). The matter is put thus in our recent decision, *Commonwealth* v. *Soares,* 377 Mass. 461, 471-472 (1979): "It is true that presence with knowledge of the planned act is insufficient alone to convict a person for the acts of another. . . . However, if an individual is, by agreement, in a position to render aid, he is an abettor even if he does not participate in the actual perpetration of the crime."

Again in discussing joint enterprise in connection with the particular crimes charged,[9] the judge made clear that to convict the jury must find "that these defendants actively participated, aided and abetted," and he stressed that "mere acquiescence, passive acquiescense, is not sufficient to maintain a conviction . . . [t]here has to be more than that. There has to be some active participation, aid or succor given." The instructions covered the subject and accordingly Whitehead's No. 19 could be refused.[10]

Although Connolly did not record an objection to the adequacy of the judge's instructions regarding intent, she seeks to question it here. Connolly speaks of "specific intent"[11] and says it means "shar[ing] with the principal his

---

[9] Connolly argues that by a turn of phrase the judge made it appear that a higher degree of participation was required for assault than for rape or robbery, but, reading the whole charge, we do not agree.

[10] No. 19 may have been too broad in its first sentence: "To render one guilty as a principal of a crime, it must be proved that she in some way participated in the commission of the offense by aiding or abetting the actual perpetration of the deed. Mere presence at the time the offense is committed and acquiescence or failure to make any effort to prevent its commission or the failure to turn in the offender is not enough."

[11] We have said of this characterization in the joint enterprise context that it "does not facilitate analysis." *Commonwealth* v. *Richards,* 363 Mass. 299, 307 n.3 (1973).

intent to commit those crimes." The judge might have used more direct language, but we think he conveyed the thought in speaking of "assent" and "arrangement," and in pointing in his charge on each crime to "knowing" participation. The judge was putting the same idea when he said, perhaps too metaphorically: "[A] definition of what is meant by acting in concert is two or more musicians playing together, making somewhat different contributions, with the common purpose of intending to produce a single result, a melody." [12]

4. *Sufficiency of the prosecution's case.* The defendants challenged the prosecution on the facts by motions for directed verdicts of acquittal made at the close of the Commonwealth's case.[13] The motions were granted as to the charges of robbery while armed, but denied as to the rest. We think the prosecution produced enough evidence of direct commission by Connolly of unarmed robbery and by both defendants of rape (female-to-female). And Whitehead's guilt of unarmed robbery and both defendants' guilt of rape (male-to-female) were supported through evidence of a joint venture with those involved in the direct commission.[14]

---

[12] In response to a question from the jury whether the joint enterprise theory applied to all the crimes charged, the judge excepted the "rape charge," and Connolly contends (also for the first time on appeal) that this somehow diminished the proof required on rape. When the charge is read connectedly, it is plain that the judge was referring at that point to the female-to-female aspect of rape and as to that was insisting on proof of direct commission, not mere participation through a joint enterprise theory. Of this Connolly could not complain.

[13] On the directed-verdict motions we are of course confined to the prosecution's case, see *Commonwealth* v. *Borans, ante* 117, 134 (1979). For the purpose we thus take no account of the following circumstances, mentioned in the Narrative but appearing from the defendants' evidence: the defendants' intimate relationship; James's telling Whitehead that the victim had $300 and "we could go partying" (the Commonwealth's evidence having shown only that Connolly had heard the statement); the victim's $10 contribution for marihuana; Moody and McQuade leaving the car with the victim at Franklin Park; Whitehead telling Connolly to put the money on the dashboard, and Connolly complying.

[14] We consider the evidence in a light favorable to the Commonwealth, *Commonwealth* v. *Sandler,* 368 Mass. 729, 740 (1975); *Commonwealth* v. *Chinn,* 6 Mass. App. Ct. 714, 715-716 (1978), indulging reasonable in-

Although there was not an explicit criminal agreement, a reasonable jury could find there was a concert of intent, coupled with participation, to rob the victim, which merged into a further such concert, also with participation, to abuse her sexually.[15] For analytic purposes the two patterns can be distinguished but in fact they were carried out largely concurrently. In fact, acts of rape took place both before and after the robbery; all were accompanied by violence.

As to the unarmed robbery, Connolly admitted to the police that John James told her the victim was carrying $300 and "they could possibly go partying" presumably with that money. McQuade testified that after the car left Columbia Point Connolly told the victim to "[g]ive up the money" and Moody made a similar demand and punched the victim in the face. Connolly took $38 from the pocket of the victim's pants. This was unarmed robbery by Connolly within the meaning of G. L. c. 265, § 19.

Regarding the complicity of Whitehead, a trier could infer from the prosecution's case that she joined with her four friends in "partying," expecting that as a group they would use the victim's money. A trier could infer further that, whether at the beginning of the journey or during it, Whitehead joined in the purpose to wrest the money from the victim if it was not surrendered voluntarily (*Commonwealth* v. *Blow*, 370 Mass. 401, 407 [1976], is a comparable case); she supplied the locus and thus a private or concealed place for the robbery.

---

ferences from the evidence, *Commonwealth* v. *Beckett,* 373 Mass. 329, 341 (1977); *Commonwealth* v. *Albano,* 373 Mass. 132, 134 (1977), and conclude that a properly functioning jury could find the defendants guilty of the relevant crimes beyond a reasonable doubt on the basis of the prosecution's case. *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979).

[15] The agreement may be implicit rather than explicit and may be proved inferentially. See *Commonwealth* v. *Blow,* 370 Mass. 401, 407 (1976); *Commonwealth* v. *Michel,* 367 Mass. 454, 457 (1975); *Commonwealth* v. *Ferguson,* 365 Mass. 1, 8 (1974); *Commonwealth* v. *DuPont,* 2 Mass. App. Ct. 566, 573 (1974).

The witnesses, however, tell a story of criminal conduct of which the robbery is but a minor part. On the way to Columbia Point the victim is forced to perform unnatural acts on one of her male tormentors; she is raped by a man in the back seat of the car on the way to Columbia Point and again while it is parked there. At this time she is passed to the front seat, violated by one defendant who passed her to the other for similar abuse, and then is returned by the defendants to the back seat. After her money is taken she is forced again to commit unnatural acts; then she is pinned to the floorboard and held down and concealed while Whitehead is obliged to stop the car and ask for directions to a gas station. There were beatings during the journey culminating in the nearly fatal stabbing and beating and abandonment.

Testimony on the female-to-female intercourse was direct from the victim. As to the male-to-female encounters, again a jury could conclude there was common intent and participation by the defendants. By mutual encouragement amounting to frenzy the purpose to rob was joined with a purpose to debase and humiliate the victim by rape. Whitehead drove the car and provided the narrow and private enclosure in which the crimes took place, all of a piece with the incident in which she chose the spot where contemplated sexual acts were to occur. Connolly joined in intimidating the victim, threatened her during the robbery, and told her to "shut up" after the robbery and rapes; thus she exerted a force on the victim that combined with the men's acts of holding the victim down with their feet. Having committed specific acts on the victim, the defendants proffered her to the men in the back seat to continue the connected crimes. Whenever the car was halted the defendants, if not immediately engaged in criminal conduct, were in effect acting "as a lookout to give warning . . . or as an ally in making escape or in meeting any eventuality." *Commonwealth* v. *Conroy,* 333 Mass. 751, 755 (1956). See the comparable situations where rape convictions have been upheld on a theory of joint venture. See *State* v. *Carter,* 66 Ariz. 12, 13-14 (1947); *People* v. *Dyer,* 217 Cal. App. 2d 176, 180 (1963);

*State* v. *Braxton,* 294 N.C. 446 (1978); *Commonwealth* v. *Shriner,* 232 Pa. Super. 306, 310 (1974). As was said of a criminal sexual melee: "As each without resentment toward his acting confederate and without concern for the girl permitted the outrage, they exemplified a united and single purpose which would brook no interference. Each thus encouraged and aided his several companions and was therefore a principal in each of the crimes." *People* v. *Bynes,* 223 Cal. App. 2d 268, 273 (1963), quoting from *People* v. *Mummert,* 57 Cal. App. 2d 849, 855 (1943). Of course women can be accessories to male-to-female rape. The accessory statute (G. L. c. 274, § 2) is gender-neutral. See also *State* v. *Carter, supra; People* v. *Elliott,* 241 Cal. App. 2d 659, cert. denied, 385 U.S. 941 (1966); *People* v. *Trumbley,* 252 Ill. 29 (1911); *State* v. *Flaherty,* 128 Me. 141 (1929).

5. *Competency of victim as witness.* Whitehead moved for a hearing before trial on the question of the competency of the victim as a witness but then waived that motion, saying she "would reserve a motion to strike [the victim's] testimony." Such a motion was made by both defendants as the victim concluded her testimony for the prosecution at trial. This method of attacking competency is rather novel[16] but the judge appeared to allow it, and denied on the merits the motion to strike. As demonstrating the witness's incompetency, the defendants relied essentially on inconsistencies between her testimony on the stand and her pretrial statements, and on her slow wit which indeed led the judge to say (out of the jury's hearing) that she was of "limited intelligence." The victim's story lacked some coherence, but the judge could take note of the conditions — nighttime, violent disorder, physical abuse — in which she made her observations, and the circumstances — extended administration of narcotic drugs to reduce pain — in which her hospital statements were given. In fact the victim's account

---

[16] See *Commonwealth* v. *Domanski,* 332 Mass. 66, 73-74 (1954), stating the normal rule that "objections to the competency of a witness if known must be made before the testimony is given."

of the happenings that night was clear in its outlines if hazy as to some details.

The question whether a person is of "sufficient understanding" (see G. L. c. 233, § 20) to be competent as a witness — a question of "[h]er capacity to observe, remember, and give expression to that which she has seen, heard, or experienced" (*Commonwealth* v. *Tatisos,* 238 Mass. 322, 325 [1921]) — is peculiarly for the trial judge, and his determination will be rarely faulted on appellate review. See *Commonwealth* v. *Sires,* 370 Mass. 541, 546 (1976); *Arena* v. *John P. Squire Co.,* 321 Mass. 423, 425 (1947); *Commonwealth* v. *Marshall,* 211 Mass. 86, 90 (1912). Perhaps that holds especially true where, as here, the judge has had the person under his eye while she was actually in the process of testifying. See *Commonwealth* v. *Welcome,* 348 Mass. 68, 69 (1964). The tendency, moreover, except in quite clear cases of incompetency, is to let the witness testify and have the triers make any proper discount for the quality of her "understanding;" [17] and so the competency has been upheld of a witness who was six years old (*Tatisos, supra*); eight and a half years old, testifying about events when she was three (*Malchanoff* v. *Truehart,* 354 Mass. 118 [1968]); insane (*Commonwealth* v. *Zelenski,* 287 Mass. 125 [1934]); alcoholic (*Commonwealth* v. *Sires, supra*). And these were cases where the proffered testimony could be thought crucial. There is little difficulty, then, in holding that the judge did not err in ruling on the motion to strike as presented to him. [18]

[17] See McCormick, Evidence § 10 (2d ed. 1972); 3 J. Weinstein & M. Berger, Weinstein's Evidence par. 601[01] (1978); Weihofen, Testimonial Competence and Credibility, 34 Geo. Wash. L. Rev. 53 (1965).

[18] We take note of a stipulation of the parties that (although not appearing of record) the judge had before him without objection certain so-called "competency reports" rendered to the assistant district attorney. These held the victim to be capable of "stating and maintaining a position" and competent "in terms of courtroom procedure and in terms of being involved in a courtroom trial." Now there is objection that the reports do not apply the legal standard of competency, but, however that may be, it was the psychiatrist who was reporting, and his notion of competency is not to be attributed to the judge who could read the reports for what they were worth.

By agreement of the parties, certain papers have been handed up to us that were not presented to the judge on the motion to strike: pretrial statements of the victim (used in her cross-examination) as well as her prior testimony in a related prosecution (cf. *Commonwealth* v. *Podlaski,* 377 Mass. 339, 349 [1979]).[19] Having given due consideration to this material, we are not shaken in the view expressed about the victim's competency as a witness.

It is possible to think of the motion to strike as a claim that the victim's knowledge of the events in suit was too meager. "Qualification to be a witness is to be distinguished from the possession of knowledge by a witness sufficient to enable him to testify concerning a specified matter." ALI, Model Code of Evidence, Comment to Rule 101, at 92 (1942), quoted in *Malchanoff, supra* at 121-122. Compare Fed. R. Evid. 601 (general rule of competency) with Fed. R. Evid. 602 (lack of personal knowledge). Sufficiency in the latter sense is properly challenged by a motion to strike. *Id.* at 122. But here the victim was testifying to her own impressions of happenings in which she was involved. Hers was not a story "inherently impossible or so fantastic that no rational person could reasonably believe it" — which would show intrinsically a lack of sufficient knowledge. ALI, *supra* at 101. See *Malchanoff, supra* at 122. Again assessment of weight was for the triers.[20]

6. *Assistance of counsel.* Connolly would have us hold, on the basis of the pretrial and trial record itself, that she

---

[19] A prosecution of John James arising from the same incident. At a trial in March, 1978, he was acquitted of assault and battery with a dangerous weapon and assault with intent to murder.

[20] The defendant Whitehead objected to the judge's failure to give a requested instruction about the jury's duty to appraise the victim's "capacity to testify" in terms of her ability to recall and relate the events. But this approached competency, which was for the judge, and as to credibility the judge's charge was adequate.

The defendant Connolly contends that the judge was too cursory on the matter of competency. On the contrary, the pretrial motion having been withdrawn, the judge, as noted, had direct observation of the victim as a witness and was well positioned to rule on the question.

did not receive effective assistance of counsel in the sense of the Sixth Amendment. (a) Her trial counsel[21] did not raise pretrial the question of the competency of the victim as a prospective witness. This is said to have been a serious mistake, but it is explainable as a tactical choice to give the witness her head and then try to break her down. The witness having testified, counsel joined in Whitehead's motion to strike the testimony on the incompetency ground. (b) The decision to put Connolly on the stand is questioned, especially as she had a lengthy criminal record by which she was impeached. However, McQuade had implicated her deeply in the events of the night, and the codefendant had chosen to testify: again counsel confronted a tactical question. (c) There is a suggestion that counsel might have tried to urge "diminished capacity" on the part of Connolly, but without getting into the legalities of the proposition (see, however, *Commonwealth* v. *Lannon,* 364 Mass. 480, 486 [1974]), we may say there was nothing in the evidence indicating that Connolly was incoherent although she testified to having had nine beers between 11 P.M. and 4 A.M. (d) Although Whitehead requested and obtained an instruction as to possible "duress" upon her by others in the car, Connolly's counsel did not raise the point. Whitehead, however, fared no better with the jury than Connolly. Counsel may have thought, not without reason, that a contention of duress could be taken by a trier as approaching an admission of acts otherwise criminal. (e) Counsel did not himself make objections to the judge's charge. But it was understood that the objections on Whitehead's part extended to Connolly. That counsel was not indifferent to the judge's charge is shown by his offering proposed instructions about joint venture.

In sum, ineffectiveness is not shown on the record of the performance. For the standard, see *Commonwealth* v. *Adams,* 374 Mass. 722, 729 (1978); *Commonwealth* v. *Saferian,* 366 Mass. 89, 98 (1974).

---

[21] Not counsel conducting the present appeal.

C. *Other Contentions.* 1. *Joint interview.* The defend-
ants after their arrest agreed to talk to Sergeant Daniel
Lyons of the Quincy police, but only on the condition that
they be interviewed together. They were given Miranda
warnings and made a joint statement, i.e., alternated more
or less in giving answers. Connolly alone now challenges
the admission of the content of the statement against her,
arguing that she was not warned that Whitehead's contri-
bution could be so used. No such point was raised by Con-
nolly on the hearing of her pretrial motion to suppress the
statement, nor did she raise it when Lyons testified about
the statement, nor did she object to the prosecution's use of
the statement in cross-examining her.[22] The argument now
made seems a lame afterthought; moreover the judge in-
structed the jury that admissions by either defendant should
not be taken against the other.

2. *Photographs.* The defendants challenged the admis-
sion in evidence of a number of double-shot photographs
(full-face with profile alongside) including photographs of
themselves in that style. As the defendants admitted their
presence in the car on the night, and identification was not
an issue, they claim the photographs were superfluous and
should have been excluded. But the judge thought, and we
agree, that the pictures could be admitted in connection
with other evidence to show that the victim was able to
match them against her recollection shortly after the
criminal incident. This was a witness whose qualifications
were challenged, and it was open to the prosecution to
bolster her credibility in this circumstantial way.

Whitehead, who had no criminal involvement that could
properly be brought before the jury, argues that the form of
her picture was objectionable; it would be recognized as a
"mug shot." As it had been "sanitized" by removal of tell-
tale notations, and no reference was made to the file from

---

[22] There was an objection by Connolly's counsel when the statement
was used in cross-examining Whitehead but it seems to have been directed
only to a casual misreading of part of the transcript.

which it came, there was no offense to *Commonwealth* v. *Gerald*, 356 Mass. 386, 388 (1966); but we have spoken with approval of *United States* v. *Fosher*, 568 F.2d 207 (1st Cir. 1978),[23] and that suggests that more should have been done: the defendants might have been shown, say, full face without profile. We think that would have been the better course. However, the jury learned that the defendants' pictures, with others, were shown to the victim after their arrest. This would divert the jury from the supposition that the defendants had criminal records apart from the accusation in the instant case. See *Fosher* at 213 n.22. (In the case of Connolly the form of the picture did not much matter as she had a lengthy criminal record by which she was impeached.)[24]

3. *"Surprise" statement.* Whitehead objected when the judge refused to strike the victim's testimony that Whitehead said, "You have to kill the lousy white trash" and "I wish she died." The victim had not mentioned these remarks in any statement she had given previously. Whitehead could properly argue from the sudden appearance of this testimony that the jury should not credit the victim (it might bear also on the issue of competency), but the judge was not obliged to rule it out (he said it was given in "good faith"). *Commonwealth* v. *Carita*, 356 Mass. 132, 140-142 (1969), is not in point.

4. *Limiting instruction.* Whitehead put in her case just after the prosecution had rested as to both defendants and directed-verdict motions had been made and acted on. When Whitehead rested, she requested an instruction that she was not to be affected by any evidence that Connolly might present. The judge denied the request "at this time" but gave the instruction as part of his charge to the jury. This is not the occasion for an analysis of when limiting in-

---

[23] See *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 309 (1979); *Commonwealth* v. *Cobb*, 374 Mass. 514, 522-523 (1978).

[24] We should add that Whitehead's picture was not of the classic full-face and profile type; both images were essentially frontal with an angular difference.

structions should be given as between codefendants, for Whitehead got the instruction she sought, and considering the content of the evidence offered by the defendants, we conclude that she was not prejudiced by the judge's deferring the instruction. Cf. *Commonwealth* v. *Ferguson,* 365 Mass. 1, 11 (1974); *Commonwealth* v. *Flynn,* 362 Mass. 455, 468 (1972).

5. *Prior convictions.* By way of impeaching Connolly, the Commonwealth on her cross-examination introduced, as a group, the records of her convictions of a number of offenses. Only one of these offenses involved any violence, and that was remote in time and not truly similar to the crimes at bar;[25] but none of the offenses bore directly on a propensity to tell the truth. The prosecutor made no point of the convictions in argument, nor did the judge advert to them in his charge to the jury. Connolly's counsel made a pretrial application to forbid the Commonwealth to introduce the convictions, which was denied, but there was no motion for a limiting instruction when the convictions went in, or for any such instruction to form part of the final jury charge. This use of the convictions to impeach was authorized by G. L. c. 233, § 21, and the right to a limiting instruction was forfeited by the omission (quite possibly tactical) to ask for it. See *Commonwealth* v. *Cook,* 351 Mass. 231, 237, cert. denied, 385 U.S. 981 (1966). We need not restate here our attitude toward the statute or our advice with regard to its application.[26] The circumstances of the present case — especially the fact that the earlier offenses were dissimilar to the instant crimes — were not particularly sympathetic for a discretionary ruling by the judge, such

---

[25] This was a conviction for assault and battery on a police officer acting in his line of duty.

[26] *Commonwealth* v. *DiMarzo,* 364 Mass. 669, 680 (1974) (Hennessey, J., concurring). *Commonwealth* v. *Delorey,* 369 Mass. 323, 331 (1975) (Hennessey, J., concurring). *Commonwealth* v. *Sheeran,* 370 Mass. 82, 86 (1976). *Commonwealth* v. *Chase,* 372 Mass. 736, 749-751 (1977). *Commonwealth* v. *Leno,* 374 Mass. 716, 717-718 (1978). *Commonwealth* v. *Roberts,* 378 Mass. 116, 128 (1979).

as we have considered suitable in some situations, that mention of the convictions be forgone. On the other hand we would not have considered such a ruling improper or inadvisable.

6. *Reference to lesbianism.* For the first time on this appeal, which is to say, too late, the defendants criticize a portion of the charge in which the judge warned the jury against allowing the defendants' sexual preferences to "sway" their judgment as to guilt or innocence, but he left it to the jury whether the defendants' relationship had any bearing on their alleged conduct with the victim. This less-than-clear remark seems to be striving to say that the mere fact of such an attachment should not lead the jury to think the defendants particularly prone to crime, but it might have a place in the jury's finding or interpreting the events in suit. The trial was not improved by the remark but we do not think it contaminated the process.[27]

D. *New Trial Motion.* 1. *Connolly.* Connolly urges error in the denial by the trial judge of her motion for a new trial made in October, 1978, some six months after verdict. She contends that the victim's testimony on the trial in July, 1978, of Moody and James showed up additional inconsistencies in the victim's story that could count as "newly discovered evidence" or as a strengthened demonstration of her incompetency as a witness. Counsel had the Moody-James

---

[27] We deal here with two other remarks by the judge. In addressing the venire, the judge said of the alleged crimes that they were sordid and involved sexual perversions and he asked the members (in effect) to indicate whether they thought they would be seriously discomfited by hearing such a case. Connolly objects for the first time on this appeal that the judge's remarks prejudiced the trial, but we take a different view of the capacities of a jury to hew to the line of their proper work.

Whitehead objects that she was prejudiced by the judge's statement, while instructing on unarmed robbery, that Connolly testified she put the money on the dashboard (correct so far) and it "was eventually in the custody of one or both of the defendants." No objection was taken at the time. In light of the record, however, the inferential statement seems to us to favor Whitehead by leaving her custody, individual or joint, in some doubt. Further, the judge had warned in the usual way that the jury could disregard any views he might intimate on the facts.

trial under observation but complains of having been handicapped by the judge's failure to make provision for counsel's obtaining a transcript of the relevant part of that trial and to allow a continuance for studying this material. Counsel had indicated, without detail, what the supposed inconsistencies consisted of, and the judge, in denying the new-trial motion as well as the application for the transcript, held in effect that there would be no basis for relief even if the inconsistencies were established. See *Commonwealth* v. *Podlaski,* 377 Mass. 339, 349 (1979) (variation in testimony from one trial to another); cf. *Commonwealth* v. *Grace,* 370 Mass. 746, 750-753 (1976) (cumulative matter). The judge was entitled to bring to bear his familiarity with the details of the original trial. On the record we are unable to say that the judge erred in denying a new trial.[28]

2. *Whitehead.* Whitehead's motion for a new trial (heard together with Connolly's) needs no separate consideration as far as it urged the victim's incompetency and renewed an argument about the judge's failure to instruct, when Whitehead rested, that she was not to be affected by Connolly's forthcoming testimony. Whitehead goes on, however, to attack an alleged vice in the manner of her sentencing. The judge, before detailing the sentences, said that the "studied brutality" in this case was "unprecedented" in his experience. He spoke of the savage beating of the victim in the car, the subsequent assault, the cutting of her throat, and "even after all that when they all had got in the car, Miss Whitehead stopped the car to allow two of those perpetrators to get out and kick that unfortunate victim after they had cut her throat." Whitehead claims this establishes that her concurrent sentences of life imprisonment for rape and unarmed robbery include a penalty or

---

[28] At the Moody-James trial referred to, Moody was charged with rape, armed robbery, assault with intent to murder, and assault and battery by means of a dangerous weapon; James was charged with rape and armed robbery. Moody was convicted of all charges except that on motion for a directed verdict the armed robbery was reduced to unarmed. James secured a directed verdict of acquittal of the charges against him.

sentence for commission of those portions of the charges of armed assault with intent to murder and assault and battery by means of a dangerous weapon of which the jury in fact acquitted her. To predicate such a connection seems to us highly speculative. The judge was describing what happened and expressing his abhorrence of it, but that is not to say that there was a sentence, superadded, for an unproved crime or crimes. The case of *Commonwealth v. Franks*, 365 Mass. 74, 81 (1974), was different, the demonstration there being quite clear that the defendant had been sentenced for a crime other than that of which he was convicted.[29] For any relief from the alleged severity of the sentences Whitehead's recourse (and Connolly's as well) is to the Appellate Division of the Superior Court under G. L. c. 278, §§ 28A-28D.

*Judgments affirmed.*

*Orders denying new trial affirmed.*

---

[29] Whitehead did not take her objection to the sentence when it was handed down, and she made no sixty-day motion under G. L. c. 278, § 29C, to revise the sentence, but for present purposes we are assuming that the point could be entertained on this appeal (see *Commonwealth v. Franks*, 365 Mass. 74, 81 [1974]), and if valid would likely result in a remand for resentencing rather than a new trial.