COMMONWEALTH vs. STEPHEN F. BLANEY, JR.

Norfolk.   September 11, 1981. — December 7, 1981.

Present: GRANT, PERRETTA, & KASS, JJ.

*Identification.   Evidence,* Photograph, Composite drawing, Judicial
discretion.

At the trial of an indictment for armed robbery where the only issue was
whether the defendant had been misidentified by the victim, the ad-
mission in evidence of a "mug shot" type photograph showing both a
frontal and a profile view of the defendant, when it was reasonably
possible to separate the two views, was error requiring reversal.
[732-735]

A composite drawing prepared by the victim of an armed robbery, work-
ing with a kit consisting of a variety of transparent overlays and with
the assistance of a police detective, was properly received in evidence
at a criminal trial to corroborate the victim's in-court identification of
the defendant. [735-736]

At the trial of an indictment for armed robbery, no abuse of discretion
appeared in the judge's refusal to allow defense counsel to ask a witness
whether the defendant's hairline in 1979 was the same as that depicted
on a composite drawing which had been admitted in evidence to cor-
roborate the victim's in-court identification. [737]

INDICTMENT found and returned in the Superior Court
Department on April 14, 1980.

The case was tried before *Young, J.*

*John P. Courtney* for the defendant.

*Charles J. Hely,* Assistant District Attorney (*E. David
Levy,* Assistant District Attorney, with him) for the Com-
monwealth.

PERRETTA, J.   The only real issue in contention at the de-
fendant's trial on an indictment charging him with armed
robbery, G. L. c. 265, § 17, was whether he had been mis-
identified by the victim.   Because a double-pose, frontal
and profile views, photograph of the defendant was intro-

duced in evidence without being severed when it was reasonably possible to separate the pictures, we reverse the judgment.

On December 9, 1979, one Gary Manzo and one Caroline Travis were at work at Andrews Pharmacy in Wellesley. About 6:00 P.M. Manzo, the pharmacist-manager, approached a man standing at the pharmacy counter in the back of the store. As Manzo was about to offer him sales assistance, the man pulled a gun from his jacket and pointed it at Manzo's side, pushing and ordering him face down behind the counter. The robber demanded dilaudid, a controlled substance, and as Manzo got up to go to the safe where the drug was kept, he saw the robber's face. Once at the safe, Manzo and the robber crouched down and Manzo again glanced at the robber's profile. The robber removed two canisters of drugs from the safe and ordered Manzo to the cash register. As Manzo rose, he caught another glimpse of the robber's profile. At the register, Manzo handed the money to the robber, who then ordered Manzo to lie down on the floor. The robber called out to a companion who had been holding Travis at bay. Manzo never saw the face of the companion, but as the two men were running out of the store, Manzo stood up, caught another glance at the robber who had taken the drugs and money, and then ducked back down behind the counter.

The police were called, and upon their arrival, Manzo described his assailant as follows: slight build, almost six feet tall, medium length darkish brown-black hair which was parted in the middle and brushed back at the sides, a prominent nose, facial hair and a moustache, and acne marks. Travis could give some descriptive details of the robber who had accosted her, but she could furnish little information about the appearance of the robber Manzo had described.

When the pharmacy was closed for the night, Manzo went to the police station and, with the assistance of a police detective, made a composite drawing of the individual he had earlier described. On January 5, 1980, Manzo returned

to the police station and looked through an array of pictures from which he selected a double-pose photograph of the man who had robbed him.

At trial, both the array and the defendant's photograph were introduced in evidence through Manzo, who also made an in-court identification of the defendant.

1. *The "Mug Shot" Photograph.*

When the Commonwealth indicated that it intended to offer as evidence the array of photographs shown to Manzo, the defendant argued that because he was not going to challenge the fairness of the array, the Commonwealth had no need to contradict a defense contention through use of the array. This argument overlooks the fact that in his opening statement to the jury, which was made immediately after the Commonwealth's statement, the defendant contended that "[w]hat happened here is simply a very common experience of misidentification. Mr. Manzo is simply in error," and, "in fact, they have the wrong man in this case." The question of the admissibility of the array was argued at the completion of opening statements and prior to Manzo's testimony. The trial judge was correct in finding that "identification is obviously the central issue and the credibility of the witness in making the identification is crucial." Cf. *Commonwealth* v. *Whitehead,* 379 Mass. 640, 659 (1980); *Commonwealth* v. *Washburn,* 5 Mass. App. Ct. 195, 196-197 (1977).

The array consisted of two single frontal-pose pictures and sixteen double-pose photographs, including the defendant's which had a clear background and which was "of the classic full-face and profile type." *Commonwealth* v. *Whitehead,* 379 Mass. at 660 n.24. Five of the double-pose pictures had what obviously appears to be a height chart in the background with a series of numbers running down the right side of each pose. These numbers can be easily translated into a height-in-inches figure. Tape was placed on the backs of the photographs, and number placards were cropped from the bottoms of the pictures.

The defendant voiced his concern about the height lines appearing in some of the photographs, and he requested, in any event, that the judge "sever the side view pictures so that they not be shown to the jury." See *Commonwealth* v. *Whitehead*, 379 Mass. at 660 ("[W]e have spoken with approval of *United States* v. *Fosher*, 568 F.2d 207 [1st Cir. 1978], and that suggests that more should have been done: the defendants might have been shown, say, full face without profile"). This the judge refused to do because "that would be to show the witness on the stand something different than what he saw in his actual picking out of the photo."

The ruling is correct to the extent that the defendant had no right to withhold his profile-pose photograph from the jury where, as here, the victim observed his assailant's profile in numerous furtive glances. There was no reason, however, to refuse to sever the double-pose pictures. *United States* v. *Fosher*, 568 F.2d 207 (1st Cir. 1978). *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 309 (1979). *Commonwealth* v. *Whitehead*, 379 Mass. at 659-660. *Commonwealth* v. *Lockley*, 381 Mass. 156, 165-166 (1980).

Altered mug shots will naturally result in the witness being shown something different from what he actually saw when making his original selection. To hold that this fact constitutes justification for a refusal to sever the photographs would be to render unenforceable the rule enunciated in *Fosher*, and approved in *Rodriguez*, *Whitehead*, and *Lockley*. Moreover, as noted in *Fosher*, 568 F.2d at 217 n.25, "The defense can be expected to cooperate, as it has the paramount interest in avoiding the prejudice which the unedited original would create. Unreasonableness by a defendant in cooperating so that the edited copy can go into evidence would be a factor to be considered by us in passing upon the question of reversible error."

We see nothing in the record which would lead us to conclude that "the photo is of probative value only if presented in its original form." *Id.* In the present case, so long as both

the frontal and profile severed poses are available to the victim and the jury, compare *Commonwealth* v. *Whitehead*, 379 Mass. at 642-645 (where the victim had far greater opportunity to observe her assailants from numerous angles), the probative value of the photographs remains undiminished while the potential for prejudice has been reduced to the lowest possible degree.[1]

The refusal to sever these photographs, which would have made further "sanitizing" also possible (see note 1, *supra*), was not harmless error. There is no dispute that the sole issue in the case was the reliability of Manzo's identification of the defendant which was made primarily on the basis of his many but fleeting glimpses of his assailant's profile. Nor is there any possibility that the jury could have speculated that the defendant's photograph was taken at the time of his arrest for the crime then under its consideration, rather than as a result of prior criminal conduct. On cross-examination, Manzo affirmed that when he chose the defendant's picture from the array at the police station, he was cautioned by the police that they would not make an arrest unless he was certain about his selection.[2] Compare *Commonwealth* v. *Whitehead*, 379 Mass. at 660 ("[T]he jury learned that the defendants' pictures, with others, were shown to the victim after their arrest. This would divert the jury from the supposition that the defendants had criminal records apart from the accusation in the instant case"). See also *United States* v. *Fosher*, 568 F.2d at 213, n.22. In his charge to the jury, the judge did instruct

---

[1] While we do not view it as "reasonably possible," *Commonwealth* v. *Lockley*, 381 Mass. at 165-166, to remove the height lines from the backgrounds of five of the double-pose photographs, the height numbers can be cropped from those pictures once they are severed.

[2] We are aware that this fact was made known to the jury through defense counsel's question, which he would have done better not to ask. *Commonwealth* v. *Cobb*, 374 Mass. 514, 522-523 (1978). But we do not regard the inquiry as an offset by the defendant of the original error which he sought to prevent by requesting that the pictures be severed. Cf. *United States* v. *Fosher*, 568 F.2d at 211, n.14.

that: "You can't draw any inferences against him simply because the police had his photograph. The police departments have pictures of people for many different reasons, and you cannot speculate on the fact." While this instruction might have had force if the pictures had been severed, we are not persuaded that it was sufficient in the present case, where the array consisted of a number of double-pose pictures which were obviously mug shots. Moreover, to regard it as sufficient would be, again, to create an exception which swallows the rule.

In conclusion, although the Commonwealth demonstrated a need for the photographs, we think that the jury could have inferred from both the pictures and Manzo's unfortunate but solicited testimony (see note 2, *supra*) that the defendant had a prior criminal record. The evidence of the defendant's guilt consisted of Manzo's identification alone, and the risk inherent in the use of mug shots was not minimized to the extent reasonably possible. In view of these circumstances, we cannot say that the error was harmless.

OTHER ISSUES

We consider the following questions which seem likely to arise at a further trial.

2. *The Composite Drawing.*

As noted earlier, several hours after the robbery, Manzo went to the police station where he, with the assistance of a police detective, prepared a composite drawing of his assailant. This composite sketch was introduced in evidence through Manzo, and both he and the detective testified as to the procedure used in making the sketch. The composite was made from an Identi-Kit consisting of six hundred transparent overlays. Each overlay is a variation of a facial feature. After establishing a facial foundation, the identifying witness chooses the features most closely matching his description. Erasures and changes are made until the witness is satisfied with the similarity of the sketch to the suspect's face.

The defendant argues that the composite drawing was inadmissible hearsay. *Commonwealth* v. *McKenna,* 355 Mass. 313, 326-327 (1969). We see no persuasive force in this argument. For purposes of evaluating the use of the drawing consistent with the underlying principles of the hearsay rule, we discern no qualitative distinction between mug shots and composite drawings which would justify the admissibility of the former but the exclusion of the latter. Both constitute extrajudicial identifications. "An extrajudicial identification made by a witness may be offered in evidence for three possible purposes: (1) for corroboration; (2) for impeachment; or (3) as substantive evidence of an identification, having probative value." *Commonwealth* v. *Vitello,* 376 Mass. 426, 458 (1978).[3] Here the composite drawing was offered in evidence to corroborate Manzo's identification of the defendant, which had been attacked from the outset.[4] Both Manzo and the police detective were extensively cross-examined about the production of the drawing. See *People* v. *Rogers,* 81 Ill. 2d 571, 578-581 (1980). Cf. *United States* v. *Moskowitz,* 581 F.2d 14 (2d Cir.), cert. denied, 439 U.S. 871 (1978), and Proposed Massachusetts Rules of Evidence 801(d)(1)(C). We see no reason why the composite sketch cannot again be similarly used. A limiting instruction as to the effect of the evidence should, of course, be given. *Commonwealth* v. *Repoza,* 382 Mass. 119, 129-130 (1980).

---

[3] An extrajudicial identification as substantive evidence of an identification is permissible where, unlike the present instance, the witness is available in court to testify but "is either unable or unwilling to make an in-court identification." *Commonwealth* v. *Vitello,* 376 Mass. at 458.

[4] In light of the substance of the defendant's opening statement, made right after the Commonwealth's, we consider it unnecessary to discuss the contention that at the time the drawing was introduced in evidence, it had no corroborative value because Manzo had not yet made an in-court identification. We do not imply that our view would be different if the defendant had delayed his opening statement or refrained from making one altogether. The trial turned on the credibility of Manzo's identification. Cf. *Commonwealth* v. *Washburn,* 5 Mass. App. Ct. at 196-197.

3. *Exclusion of Testimony.*

Dr. Carl Harris had seen the defendant several times in 1979, but no later than in October of that year. He also saw him in February of 1980. This witness was allowed to testify to his observations of the defendant's build and complexion in 1979. The judge, however, would not allow defense counsel to ask the witness whether the defendant's hairline in 1979 was the same as that depicted on the composite drawing. The judge's ruling was based upon the fact that a sufficient foundation for the question did not exist: the hairstyle could have been changed, and the features on the composite, unlike those on a photograph, had come from a kit. The judge did not abuse his discretion in refusing to allow that vein of inquiry to the defendant. See *Commonwealth* v. *Chasson*, 383 Mass. 183, 187 (1981). See also *Commonwealth* v. *Happnie*, 3 Mass. App. Ct. 193, 198 (1975).

4. *The Defendant's Motion in Limine.*

The defendant sought through a motion in limine to restrict the scope of the Commonwealth's cross-examination of alibi witnesses. He claims that the judge's pretrial ruling on the motion was erroneous and that, as a result of the ruling, he did not go forward with his alibi defense. Should the defendant decide to raise this defense on retrial, the Commonwealth must conduct its cross-examination in accordance with *Commonwealth* v. *Palmarin*, 378 Mass. 474, 477-478 (1979), *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296-297 (1981), and with G. L. c. 278, § 23. Any incursions over the boundaries of proper cross-examination, can be guarded against in the customary fashion. We will not hold that a judge is required to rule on a motion in limine prior to trial, although it is preferable that he do so. Cf. *United States* v. *Oakes*, 565 F.2d 170 (1st Cir. 1977); *Commonwealth* v. *Diaz*, 383 Mass. 73, 81-82 (1981).

The judgment is reversed, and the verdict is set aside.

*So ordered.*