RAFAELE L. DEMOULAS, administratrix,[1] & others[2] *vs.*
TELEMACHUS A. DEMOULAS & others.[3]

Middlesex. September 3, 1998. - December 22, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Jury and Jurors. Practice, Civil,* Challenge of jurors, Deposition. *Evidence,*
Competency, Value. *Witness,* Competency. *Corporation,* Stock, Valuation
of stock, Close corporation, Officers and agents. *Fiduciary. Trust,* Construc-
tive trust. *Uniform Commercial Code,* Investment securities. *Securities,*
Sale. *Bona Fide Purchaser. Damages,* Restitution, Rescission. *Due Process
of Law,* Hearing, Notice. *Words,* "Fair value," "Notice," "Adverse claim."

In a civil action in which there were five plaintiffs and six defendants, the ap-
propriate number of peremptory challenges under G. L. c. 234, § 29, and
Mass. R. Civ. P. 47 (b), should have been thirty-six for each side; however,
there was no showing of error requiring a mistrial in the judge's having al-
lowed each side twenty-five peremptory challenges. [559-561]

In a civil action, the judge did not err in allowing in evidence deposition
testimony of a witness who was incompetent at the time of trial, upon an
implicit finding that the witness was competent at the times she was
deposed, and the judge properly instructed the jury that they were to
determine what weight to give to the deposition. [562-565]

In a civil action, the prior deposition testimony of a presently incompetent
witness did not demonstrate such inherent unreliability that the jury should
not have heard it. [565-566]

In a civil action alleging fraud and conversion in a fiduciary's violation of his
duty, evidence of the "fair value" of the closely held stock and partnership
interests, not discounted to reflect lack of liquidity and additional risk, was
relevant to demonstrate the fiduciary's self-dealing. [566-569]

After the trial of a civil action, the judge properly imposed a constructive trust
on certain shares of stock for the benefit of the plaintiffs; however, where
an untried issue remained as to whether certain of the defendants held the
stock as bona fide purchasers, that issue was remanded for a further evi-
dentiary hearing [572-579], and those defendants were also to be afforded
an opportunity not afforded at trial to demonstrate their status as bona fide
purchasers of certain other interests that the judge had ordered, as an equit-
able remedy, transferred from the defendants to the plaintiffs [579-583].

---

[1]Of the estate of Evan G. Demoulas and as next friend of Vanessa Evan De-
moulas.

[2]Diana D. Merriam, Fotene J. Demoulas, Arthur S. Demoulas, and Evanthea
Demoulas.

[3]Arthur T. Demoulas; Glorianne D. Farnham; Caren D. Pasquale; Frances
D. Kettenbach; and Demoulas Super Markets, Inc.

In a civil action, the judge did not err in ordering the rescission of a transfer of certain shares in a closely-held corporation and the return of the shares to the plaintiffs, and the judge correctly concluded that the defendant corporate entity holding the shares was not entitled, through the operation of G. L. c. 106, § 8-301 (1), to bona fide purchaser status. [583-586]

In a civil action, the judge correctly awarded equitable relief to the plaintiffs based on the jury's responses to special questions, and an evidentiary hearing was not required [586-589, 589-590]; and the judge properly entered separate and final judgment as to that relief [590-591].

CIVIL ACTION commenced in the Superior Court Department on April 30, 1990.

Following review by this court, 424 Mass. 501 (1997), further proceedings were had before *Maria I. Lopez*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Edward J. Barshak* (*Susan A. Hartnett* & *Christine M. Netski* with him) for Demoulas Super Markets, Inc.

*Toni G. Wolfman* (*Judith Gail Dein* with her) for Arthur T. Demoulas & others.

*Robert C. Gerrard* ( *Carol R. Cohen, Thomas S. Fitzpatrick* & *Anthony R. Pelusi, Jr.*, with him) for Rafaele L. Demoulas.

GREANEY, J. We granted an application for direct appellate review to consider the appeal by the defendants from the second amended judgment entered in this case on September 2, 1997. In a related case, *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501 (1997) (*Demoulas I*), we affirmed, for the most part, judgments entered in stockholder derivative and contempt actions. We upheld the judge's conclusions that Telemachus A. Demoulas (Telemachus), the primary defendant in this case, and other defendants (several of whom are also defendants in this case), had participated in, or benefited from, numerous improper diversions of corporate opportunities and self-dealing transactions to the detriment of Demoulas Super Markets, Inc. (DSM), and other corporations and businesses. We concluded as well that the judge had correctly based her remedies for the many wrongs committed on the principle of preventing unjust enrichment, and that she appropriately ordered (with certain adjustments) rescission of the improper transactions and disgorgement of wrongful gains. We also affirmed a judgment of contempt against DSM for violating an injunction through the wrongful payout of undistributed corporate earnings.

In this action, the widow and children of George Demoulas (George), the brother of Telemachus, charged that Telemachus, acting for himself, DSM, and his children (defendant children), had used wrongful means to acquire a greater share of ownership in DSM and other entities, at the expense of members of George's family. The case was tried to a jury. At the conclusion of the plaintiffs' case, a motion for directed verdict filed by the defendant children was allowed, and the jury did not consider the plaintiffs' claims against them. The jury returned answers to special questions on the plaintiffs' remaining claims and found that Telemachus had committed fraud, conversion, and breach of fiduciary duties with respect to substantial estate and trust assets. The jury went on to conclude, in great detail, that Telemachus's considerable wrongdoing included the transfer, purchase, and redemption of DSM and other stock belonging to George's widow, Evanthea Demoulas (Evanthea), and Evanthea and George's children (plaintiff children), the other plaintiffs, as well as wrongdoing in connection with the ownership of real estate. Among other effects, the result of the misdeeds found by the jury was, over a period of time, to increase the proportion of DSM stock in the control of Telemachus's side of the family to 92%, to the almost total exclusion of George's side of the family.

Based on the jury's findings, the judge, after lengthy and contentious posttrial hearings, ordered relief essentially in the form of rescission and reformation. On appeal, the defendants do not dispute that the jury's findings were warranted on the evidence they heard. Telemachus maintains, however, that there must be a new trial for several reasons. The defendant children claim that it was error for the judge to impose a constructive trust on DSM stock they own, and to reform a real estate partnership to take away some of their ownership. DSM challenges a ruling concerning redemption of some of its shares and contests the relief ordered against it. The respective arguments of the defendants will be explained as we resolve the issues in each of the three appeals.[4] We conclude that Telemachus and DSM make no argument that entitles them to judgment in their favor or a new trial. We also conclude that the defendant

---

[4]The defendants also appeal from the judge's denial of the their motion to recuse her from the case on the ground of bias. This issue has been decided adversely to the defendants in *Demoulas* v. *Demoulas Super Mkts., Inc., ante* 543, 546-552 (1998).

children are entitled to an evidentiary hearing to decide whether they were bona fide purchasers of the DSM stock and partnership interests they acquired.

### APPEAL OF TELEMACHUS.

1. Telemachus contends that there must be a new trial because the judge failed to grant the defendants the correct number of peremptory challenges. The background necessary to resolution of this issue is as follows.

The trial posed a challenge for the judge in terms of its complexity and the need to deal with the considerable acrimony between the parties. The plaintiffs' fourth amended complaint was 125 pages long, and a voluminous file of pretrial pleadings had been assembled. There were teams of lawyers on each side. It was anticipated that the trial would be long. (It lasted eighty-five days. There were seventy-two days of actual trial, and the jury deliberated for thirteen days and delivered twenty-six pages of findings in answer to special questions.)

The judge held a pretrial conference which was recorded. At that conference, the allotment of peremptory challenges was discussed in connection with the judge's decision (agreed to by all counsel) to empanel a jury of sixteen members.

At the time of trial, there were five plaintiffs, and six defendants. There was considerable indecision and disagreement on the part of all counsel as to the proper number of peremptory challenges available to each side. One of the plaintiffs' counsel thought that requirements governing the number of peremptory challenges, when a jury of sixteen members are selected, called for twenty-four challenges. Another of the plaintiffs' counsel stated that, the plaintiffs' team had done "the math," and the team had concluded that each side should get 120 peremptory challenges. In response to this proposition, the judge stated, "It is not going to happen." Counsel for Telemachus (acting on behalf of all defendants) stated that he wanted to "check [the] Rule," before agreeing to a prescribed number of peremptory challenges because, as he said, "each one of [the defendants] has his or her own peremptories." The judge concluded the disagreement among counsel with the following ruling: "Well, whatever the Rule is, I am going to be efficient here. I think, having given it a little thought before you all came in here, I think you are each [meaning each side] going to get twenty-five." The plaintiffs accepted this al-

lotment. Counsel for Telemachus (still acting on behalf of all the defendants) did not, and he stated his opinion that the defendants were entitled to five more challenges.

Jury selection proceeded. The plaintiffs' counsel exercised twenty peremptory challenges. Counsel for Telemachus exercised all twenty-five challenges granted by the judge, and was denied the five additional challenges to which he claimed the defendants were entitled. He later argued to the judge that the defendants "would have used some or all of [the five additional claimed challenges]" in selecting the jury if they had been granted, but he failed to designate which juror or jurors in the final seating would have been struck had the extra challenges been made available.

The matter of peremptory challenges in a civil case is governed by G. L. c. 234, § 29, which states that "each party shall be entitled to four peremptory challenges," and by Mass. R. Civ. P. 47 (b), 365 Mass. 812 (1974), which states, in pertinent part, that, in addition to the challenges allowed by the statute, "[e]ach side [will be] entitled to . . . 2 peremptory challenges if 3 or 4 additional jurors are to be impanelled." There is a difference between the language of the statute ("each party"), and that of the rule ("each side"). "Although Rule 47(b), in setting forth the right to additional peremptory challenges when additional jurors are impaneled, talks of each 'side' (as opposed to 'party'), no sound reason precludes allowing the additional challenges to each party entitled to the four initial peremptory challenges (although on the same side of the versus)." J.W. Smith & H.B. Zobel, Rules Practice § 47.4, at 167-168 (1977 & Supp. 1998).

Reading the statute and the rule to give them consistency, we calculate that the plaintiffs and the defendants should have had thirty-six peremptory challenges on each side.[5] In arguing that there must be a new trial because the defendants were deprived

[5]The language of G. L. c. 234, § 29, "each party shall be entitled to four peremptory challenges," does not expressly provide for an equal number of peremptory challenges for each side. Prior to 1979, the statute read in part: "*In every criminal case the commonwealth shall be entitled to as many [peremptory] challenges as equal the whole number to which all the defendants in the case are entitled.* In a civil case each party shall be entitled to four such challenges." (Emphasis added.) G. L. c. 234, § 29, as amended through St. 1972, c. 285.

In 1979, the statute was rewritten to read as it does now: "In a civil case each party shall be entitled to four peremptory challenges. . . ." G. L.

of additional peremptory challenges, Telemachus relies primarily on criminal cases where we have carefully scrutinized any claimed errors with respect to such challenges in order to protect the liberty interests of defendants. A representative list of decisions which he cites is set forth in the margin.[6]

This case stands on a different footing. In a civil case, " 'a refusal to allow the proper number of peremptory challenges [is] regarded as immaterial in the absence of a showing that the party affected was required to accept one or more jurors whom he wished to challenge' (*Tamburello* v. *Welch*, 392 S.W.2d 114, 116 [Tex. 1965]), or in the absence of a showing that the ruling affected the jury's verdict in some material way. *Id.* at 117-118." *Andras* v. *Marcyoniak*, 13 Mass. App. Ct. 1043, 1044 (1982), citing *Upchurch* v. *Barnes*, 197 So. 2d 26, 27-28 (Fla. Dist. Ct. App. 1967). Cf. *Rickett* v. *Hayes*, 256 Ark. 893, 895-896 (1974). When a new trial is sought in a civil case because of a miscalculation in the number of peremptory challenges, a measure of discretion exists in deciding whether either of these factors has been clearly demonstrated by the complaining party.

c. 234, § 29, as appearing in St. 1979, c. 344, § 10. The language of "entitlement" of the opposing party to an amount of challenges equal to that of the other party was eliminated, possibly suggesting that the proposition was limited to criminal cases. A treatise on the rules of civil procedure states that "whenever each defendant has four peremptory challenges, plaintiff is reciprocally entitled to four peremptory challenges for each defendant. The same principle obtains when an action involves multiple plaintiffs." J.W. Smith & H.B. Zobel, Rules Practice § 47.4, at 167-168 (1977 & Supp. 1998). The treatise cites for this conclusion *Hendrickson* v. *Drewrys Ltd. U.S.A.*, 349 Mass. 679 (1965). While the treatise's citation predates the change in the statute's language, its observation of "the Rules' deliberate encouragement of free joinder," and the Legislature's efforts to make the statute consistent with the rules of civil procedure, persuade us that this principle may be applied in cases, such as the present one, where joinder brings multiple defendants into the case. J.W. Smith & H.B. Zobel, *supra.*

[6]See, e.g., *Commonwealth* v. *Green*, 420 Mass. 771, 776-778 (1995) (reversible error, without showing of prejudice, to erroneously disallow exercise of peremptory challenges when clear and specific and nonrace-based reasons for challenging jurors given; purpose of peremptory challenges is to aid in assuring constitutional right to fair and impartial jury in criminal trial); *Commonwealth* v. *Auguste*, 414 Mass. 51, 58 (1992) (reversible error to force defendant to exhaust peremptory challenges on potential jurors who could have been excused for bias); *Commonwealth* v. *Sheehy*, 412 Mass. 235, 239-40 (1992) (reversible error to allow alternates to be in presence of sitting jury); *Commonwealth* v. *Brown*, 395 Mass. 604, 606 (1985) (reversible error to require criminal defendant to exercise peremptory challenges before full number of jurors obtained).

See *Andras* v. *Marcyoniak, supra,* and cases cited. On the procedural background previously set forth, there has been no showing of error that would require a retrial.

2. An important witness in the plaintiffs' case was the plaintiff, Evanthea, who, as George's widow, was a cofiduciary with Telemachus in administering and distributing George's estate and other assets. In answering the special questions posed to them, and finding that Telemachus had engaged in massive wrongdoing, the jury appear to have relied on Evanthea's testimony. That testimony was introduced through the reading of her deposition to the jury because Evanthea, at the time of trial, was incompetent to testify due to a serious "memory loss condition." Telemachus argues that the judge erred in admitting Evanthea's deposition testimony because Evanthea was incompetent when she gave her deposition. The following is the background necessary to resolution of the issue.

One of the central questions at the trial was whether Evanthea was aware of, and understood, the transactions memorialized in the several documents she executed, involving both George's and her own assets. These transactions shifted some of the ownership in DSM and other businesses from George's side of the family to Telemachus's side. The plaintiffs alleged that she had not been fully informed by Telemachus as to the full legal significance of the transactions and as to the fairness of the prices received. The defendants maintained that Evanthea initiated the transactions and understood and consented to all their terms.

On the sixteenth day of trial, February 1, 1994, counsel for the plaintiffs told the judge in a recorded lobby conference that it was unlikely they would be able to put Evanthea on the witness stand because of her then-existing medical condition. The plaintiffs sought instead to introduce in evidence before the jury Evanthea's deposition testimony, which had been taken in March, June, and July of 1991, and July of 1992, and which concerned transactions that had taken place between 1971 and 1982. The judge discussed with counsel the procedure by which she would decide Evanthea's competency, both current, and at the time of her deposition. The plaintiffs offered to present Evanthea's physician to the court ex parte. Counsel for the defendants objected to the offer. The judge, in response to the defense objection, said, "I don't know if you are entitled to cross-examine on that issue. Competency is a question for the

Judge." Subsequently, the judge agreed to allow the defendants' counsel to examine Evanthea's medical records with their own expert and to present another opinion regarding her competency at the planned hearing with Evanthea's physician. On that day, the judge stated, once again, that, "as a matter of law, the issue of competency is exclusively for [me to decide]." The judge concluded that Evanthea was not competent to testify, but that her deposition could be read to the jury, and that she (the judge) would make a statement to them that Evanthea's condition was such that Evanthea could have both short term and long term memory loss. The judge went on to say: "And [the deposition testimony will be admitted] for the weight that the jury [choose] to give [to it]. Since I can't decide and no one here knows, I'm going to let them give it whatever weight they want." Further, the judge stated that there was a "presumption towards competency and [that a judge should] let the jury decide. [The jury's function] goes to weight, to the extent that it's unclear, when there's a question."

On the day that the doctors' statements as to Evanthea's past condition and her deposition were to be introduced in evidence, the judge stated that she had no basis on which to exclude Evanthea's deposition. The judge subsequently instructed the jury that she was "unable, as a matter of law, to decide [Evanthea's] competency at [the] time [her deposition was given]." The judge told the jury that counsel for both sides would be allowed to read statements prepared by medical experts, and that the deposition would be read to them. She charged them with the responsibility of deciding "what weight to give [Evanthea's] testimony."

Telemachus argues that (a) the judge erred by not affirmatively deciding Evanthea's competency to testify at the time of her deposition; and (b) an examination of the record of her deposition does not support a finding of her competence as a matter of law.

(a) The judge understood her role as a gatekeeper, and, by not finding Evanthea to be unquestionably incompetent, admitted her testimony as competent. Under G. L. c. 233, § 20, "Any person of sufficient understanding, although a party, may testify in any proceeding, civil or criminal . . . ." Preliminary questions concerning the qualification or competency of a person to be a witness are reserved almost exclusively to the judge. See *Commonwealth* v. *Brusgulis*, 398 Mass. 325, 329 (1986). A

judge possesses discretion to determine the method by which a witness's competency is to be tested. See *id.* at 329-330. In the usual case, the judge conducts a voir dire examination of the witness, but the judge may require an examination of the witness's mental condition by a physician or other expert if appropriate to resolution of the issue. See P.J. Liacos, Massachusetts Evidence § 6.3, at 262 (6th ed. 1994 & Supp. 1998); G. L. c. 123, § 19. See also *Commonwealth* v. *Gibbons*, 378 Mass. 766, 771-773 (1979).

This is not the usual case. The judge's and the medical experts' only tools to determine Evanthea's competency in 1991 and 1992, when her deposition was taken, were the text of her deposition testimony and a report from a physician who had examined her at about the time the deposition was taken. That physician's report indicated that she demonstrated at that time significant short-term memory loss, problems with concentration and possible depression. He apparently did not examine her for evidence of long-term memory loss.[7]

The reports of the medical experts retained by the parties, as to Evanthea's competency at the time of her deposition, were inconclusive. The defendants' expert concluded that Evanthea's deposition testimony was unreliable because of memory impairments. The plaintiffs' expert equivocated as to whether Evanthea's inability to provide answers to many questions posed at the deposition was a result of memory impairment. Based on these inconclusive opinions, the judge decided to admit Evanthea's deposition testimony.

The defendants principally rely on *Commonwealth* v. *Reagan*, 175 Mass. 335 (1900), and its progeny for the proposition that the judge erred in allowing Evanthea's deposition testimony in evidence. The *Reagan* case holds that, if the competency of a witness is challenged, the judge must examine the witness and can allow testimony only if satisfied as to competency. See *id.* at 340. See also *Commonwealth* v. *Gibbons*, *supra* at 778. The plaintiffs rely on *Commonwealth* v. *Whitehead*, 379 Mass. 640, 656 (1980), and argue that prior recorded testimony is to be admitted unless the judge is convinced the witness is incompetent. As Justice Kaplan said in the *Whitehead* case, "[t]he

---

[7]Evidently no one raised the issue of competency at the time of Evanthea's deposition. In view of the content of her testimony and ability to recollect at the deposition, Telemachus might reasonably have raised the issue at that time.

tendency . . . except in quite clear cases of incompetency, is to let the witness testify and have the triers make any proper discount for the quality of her understanding." *Id.*[8] We read the cases together to mean that, under the modern trend, a judge may accept as competent for testimony a witness whose reliability is, in her judgment, at most, marginally sufficient.

The judge, in allowing Evanthea's deposition testimony in evidence, implicitly decided that, at the time of her deposition, Evanthea was competent under the standard articulated in the *Whitehead* case. The judge's choice of language used in front of the jury was unfortunate, but viewed in the light of her prior statements clearly indicating that she understood her role as gatekeeper, we conclude that she admitted the evidence because she did not think Evanthea was "clearly incompetent," and therefore, was "competent."[9]

Finally, the judge's instructions to the jury did not impose on them an improper duty to decide Evanthea's competency. While the judge told the jury that she could not decide Evanthea's competency, she assigned to the jury only the duty of weighing Evanthea's testimony. The judge's use of the word "weight" expresses a term of art. In the context of the entire jury instructions on the issue, the term reasonably suggested to the jury, not that they had the sole obligation of qualifying the deposition testimony as admissible evidence, but that they only had to

---

[8]In support of this proposition, *Commonwealth* v. *Whitehead*, 379 Mass. 640, 656 n.17 (1980), cites McCormick, Evidence § 10 (2d ed. 1972); 3 J. Weinstein & M. Berger, Weinstein's Evidence par. 601[01] (1978); Weihofen, Testimonial Competence and Credibility, 34 Geo. Wash. L. Rev. 53 (1965).

[9]In analogous areas, appellate courts have found that trial judges implicitly imported preliminary findings into rulings admitting evidence. For example, the hearsay rule for the admission of a statement of a deceased person requires a judge to make a preliminary finding that the declaration was made in good faith and with personal knowledge. See G. L. c. 233, § 65; *Old Colony Trust Co.* v. *Shaw*, 348 Mass. 212, 216 (1964). In a case where a judge did not articulate the necessary findings, but instead declared, "I'll let the jury decide whether the statements were made in good faith," the Appeals Court stated that "admission of the deceased person's alleged statements imports findings by the judge of that person's personal knowledge and good faith." *Mitchell* v. *Hastings & Koch Enters., Inc.*, 38 Mass. App. Ct. 271, 275 (1995). For similar conclusions, see *Stanton's Case*, 331 Mass. 378, 379-380 (1954); *O'Brien* v. *Bernoi*, 297 Mass. 271, 274 (1937); *Rothwell* v. *First Nat'l Bank*, 286 Mass. 417, 420 (1934); *Reni* v. *Courtney*, 4 Mass. App. Ct. 235, 237 (1976). See also *Ricciutti* v. *Sylvania Elec. Prods. Inc.*, 343 Mass. 347, 351 (1961) (admission of documents implies finding of facts prerequisite to their admission).

decide how much to rely on the deposition in reaching their factual conclusions in answer to the special questions.

(b) Telemachus next argues that the judge "plainly erred in admitting the deposition testimony despite the clear absence of any affirmative evidence that Evanthea's memory was intact at the time her deposition was taken." He requests that we examine the record on the issue of Evanthea's competency de novo, and he maintains that such an inquiry establishes, as a matter of law, that the jury should not have been allowed to consider the evidence.

A two-part test applies to determine competency: whether the witness has the general ability or capacity to (1) "observe, remember, and give expression to that which she ha[s] seen, heard, or experienced"; and (2) "comprehend the difference between truth and falsehood." *Commonwealth* v. *Brusgulis, supra* at 329, quoting *Commonwealth* v. *Tatisos*, 238 Mass. 322, 325 (1921). While Evanthea was not directly questioned as to whether she understood truth from falsehood, she was able to remember, and to articulate, her recollection in several areas of the dispute that were highly relevant. For example, Evanthea testified that, when her signature was needed on a legal document, she would be called on the telephone by Telemachus and told to go to the family lawyer's office. Once there, the document's purpose was not explained by anyone; she was merely told to sign the document. Evanthea rarely read documents she was asked to sign. In at least one instance, she was not allowed to take a document home to show it to her children. Evanthea was emphatic that she had trusted Telemachus and the family lawyers, and she had believed that they were acting properly in her behalf and in behalf of George's estate. She recalled being told by, and not distrusting, Telemachus that she must sell her DSM stock because she did not work in the company, and she remembered hearing from her son Evan that Telemachus wanted Evan to sell him his DSM stock. Other key events were similarly recounted by Evanthea.

The defendants point to the medical experts' opinions and the inconsistency of Evanthea's answers to many questions as conclusive proof of incompetency. However, the medical experts disagreed about Evanthea's competency. Further, inconsistencies in a witness's testimony do not establish incompetency, but usually raise issues of credibility and weight for the factfinder to decide. See *Commonwealth* v. *Lamontagne*, 42 Mass. App.

Ct. 213, 218 (1997). While Evanthea's answers to questions frequently were, "I don't know," or "I don't remember," or occasionally inconsistent, she was able to remember and describe consistently many critical events that were relevant to the matters before the jury. It is difficult from the deposition testimony to determine whether Evanthea's inability to answer questions was due to lack of knowledge or memory impairment, but, considered as a whole, her testimony was not so inherently unreliable that the jury should not have heard it.

3. Telemachus's final contention is that the judge erred in admitting evidence of the "fair value" of DSM stock and other interests purchased by Telemachus from the plaintiffs because that valuation technique does not discount for a minority interest or poor marketability of closely held interests. He contends that the jury's answers to special questions as to the values of the stocks and other interests are wrong because they were influenced by this evidence.

The plaintiffs claimed, and the jury found, that Telemachus had violated his fiduciary duty, committed fraud, and, in some cases, committed conversion with respect to twelve transactions in his role as coexecutor of George's estate with Evanthea and as her trusted advisor. Eleven of the twelve transactions involved the sale of corporate or partnership interests in family entities from George's estate to Telemachus, a member of Telemachus's immediate family, or DSM employees with whom Telemachus had a close working relationship.[10] These transactions gave, and later expanded, a controlling majority interest in the entities to Telemachus's family. The plaintiffs argued that Telemachus knowingly sold these assets to himself or his family members from George's estate at inadequate prices. The value of the assets was thus an important issue, both to determine whether the prices paid were inadequate, and as it turned out later, to determine an appropriate remedy for the wrongdoing that had been committed.

Both sides introduced testimony from expert witnesses about the value of the closely held stock and the partnership interests.[11] The experts for the plaintiffs, over objection, provided testimony

[10]The twelfth transaction involved the creation by Telemachus of Delta & Delta Realty Trust (Delta & Delta), which was formed as a trust but conducted as a partnership, in which George's family's holding was less than 50%.

[11]The interests at stake concerned the stock of DSM, the Delta & Delta

as to the "fair value" of the assets, and the experts for the defendants, over objection, provided testimony as to the "fair market value" of the assets. One of the plaintiffs' experts defined "fair value," in regard to valuation of corporations, as "the proportional share of the [value of the] entire enterprise . . . owned by each stockholder in accordance with the percent of stock they own." "Fair market value," on the other hand, was defined by one of the defendants' experts as "the price at which an asset will change hands between a willing buyer and a willing seller with neither party being under compulsion to buy or sell and with both parties having full knowledge of all relevant facts." Because the assets involved minority interests, not actively traded on the open market, one of the defendants' experts stated that, in order to arrive at "fair market value," the price needed to be discounted to reflect lack of liquidity and additional risk. Further discounts were made to the price of the DSM and Valley stocks in George's estate to reflect that ownership was subject to voting trust agreements, which included a relinquishment of the right to vote the shares and receive dividends; that a right of first refusal was reserved by DSM and Valley as to the sale of any of their respective stocks; and that the companies were heavily dependent on the leadership of Telemachus, whose health had declined over the years. The valuation of the interests in Delta & Delta was subject to a similar dispute. The application of these two different approaches to valuation resulted in a wide disparity in reported values.

Telemachus claims that it was error to admit the evidence of "fair value" because that calculation does not take into account the discounts mentioned above. He asserts that, "[t]he evidence relating to price was admitted solely as evidence of [his] alleged misconduct in arranging the sales of the plaintiffs' stock and partnership interests," and that the evidence was only relevant to determine whether the plaintiffs received a fair price for their assets, and not whether he was receiving a personal gain or advantage from the transactions. Telemachus further

---

partnership, and the stock of Valley Properties, Inc.

Delta & Delta was formed in 1971 to hold real estate and will be discussed in detail later in this opinion. Telemachus caused Valley Properties, Inc. (Valley), to be formed in April of 1974. He merged three realty trusts, in which he and George had had equal ownership, into this corporation. Initially, the two families had equal ownership in Valley; by the end of 1977, Telemachus's family had a controlling interest.

contends that the judge allowed the jury to find violations of fiduciary duty, fraud, and conversion based on their valuation conclusions derived from the experts' testimony.[12] He agrees that a fiduciary in his various positions has a duty to obtain the "best price possible" for assets sold, but he argues that that standard calls for "fair market value," not "fair value." If the jury's valuation conclusions were based even in part on "fair values," Telemachus maintains, it is error. "Fair value," he says, may come into play in selecting a remedy, but it should not be used as a basis for finding liability. To support all these arguments, Telemachus relies heavily on the recent Appeals Court decision in *Shear* v. *Gabovitch*, 43 Mass. App. Ct. 650 (1997).

We reject his arguments. In the *Shear* case, the Appeals Court concluded that trustees did not breach their fiduciary duty by selling a minority interest to majority shareholders in a close corporation for "fair market value," which included a discount for lack of marketability. See *id.* at 676-678. This conclusion does not mean, as Telemachus asserts, that fair market value is the only relevant value when examining sales of minority interests by a fiduciary. In *Shear*, the plaintiff was the beneficiary of trusts holding stock representing a one-third interest in a closely held corporation. She sued the trustees, alleging, among other issues, that the trustees violated their fiduciary duty by failing to obtain an adequate price when the trustees sold the stock, at her request, to the corporation's two other shareholders. In *Shear*, the minority shareholders themselves instigated the sale, and the trustees were not self-interested as shareholders. *Id.* at 677. In this case, the asset holders, Evanthea and the plaintiff children, did not precipitate the sales. Instead, Telemachus, acting as a fiduciary, initiated the sales, and he was, or stood to become (with his family), the majority shareholder in DSM and the other interests at issue. Telemachus's role cannot be equated in any relevant way with the role of the trustees in *Shear*.

The *Shear* case goes on to expressly recognize that a minor-

---

[12]This does not mean that the jury did, in fact, base their findings on these issues solely on the valuations they found. The plaintiffs presented evidence warranting findings that considerable wrongdoing had taken place, including evidence that, because of the trust they placed in Telemachus and the family lawyers, they were not informed about, and did not understand, the nature of the transactions that took place.

ity discount is not always appropriate where minority shares are being sold to the majority shareholders. *Id.* at 677, citing 12B Fletcher, Cyclopedia of Private Corporations § 5906.120, at 435 (1993). In *Shear*, the court said, "[i]n such a situation, the minority shares are freed from the limitations of minority status, and there is no reason the sellers should not receive full, i.e., undiscounted, value." *Id.* There is no reason in this case, where a controlling shareholder (or one seeking to become one) has brought about the transactions, and where a minority shareholder is authorized, but not obligated, to sell, that evidence of the undiscounted value would not have relevance. These arguments are equally applicable to the valuation of the partnership interests in Delta & Delta.

The "clear error" that Telemachus asserts would most logically apply in the reverse situation, where the minority shareholders or owners instigate and desire the sale. Here, had the plaintiffs known and understood that Telemachus, by acquiring the DSM and Valley shares for himself and his children, would make his family the controlling owners of the interests, they would have had no reason to think that the opening offer should include market discounts. Evidence of undiscounted value thus has probative force, because the minority interests might not have chosen to sell to Telemachus and his family at discounted values if full disclosure had been made. Therefore, evidence of fair value tended to show a violation of obligations on Telemachus's part, and tended to show that he was self-dealing in a way which failed to obtain the "best possible price" for the assets transferred from George's estate.

### APPEAL OF THE CHILDREN OF TELEMACHUS.

4. The defendant children of Telemachus (Arthur T. Demoulas, Glorianne D. Farnham, Caren D. Pasquale, and Frances D. Kettenbach), appeal from the portion of the judgment imposing a constructive trust on the 400 shares of DSM stock they acquired from George's estate. They argue that the judge erred in concluding that, as a matter of law, they were not bona fide purchasers of the stock, and, if this contention is rejected, they argue alternatively, that they should have been allowed to present evidence that they were entitled to that protected status. The background necessary to resolution of these issues is as follows.

When George died in 1971, he held, among other assets,

1,220 shares of DSM stock. In his will, he directed that 920 shares be placed in one of two trusts for the benefit of Evanthea, and that 300 shares be placed in trusts for the benefit of the plaintiff children (Evan G. Demoulas, Diana D. Merriam, Fotene Demoulas, and Arthur S. Demoulas). Telemachus and Evanthea were named co-executors of the will and cotrustees of the testamentary trusts. On January 20, 1977, Telemachus, as coexecutor, arranged the sale of the 920 shares of DSM stock to the defendant children, the plaintiff children, two long-time employees of DSM (James Miamis and Julian Lacourse), and to himself.[13]

The plaintiffs' fourth amended complaint made claims against the defendant children, asserting that they were liable along with Telemachus for his fraud and violations of fiduciary duty, and further asserting that the defendant children were not bona fide purchasers for value of 400 shares of DSM stock transferred to them in 1977 from George's estate by Telemachus and Evanthea as coexecutors. The plaintiffs' fourth amended complaint also requested that the judge impose a constructive trust on all property unlawfully sold, transferred, or redeemed from the plaintiffs, including the DSM stock sold to the defendant children in 1977.

At the conclusion of the plaintiffs' case against all the defendants, the defendant children moved under Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974), for a directed verdict. The judge allowed the motion. In her written memorandum of decision, she concluded that (a) "[t]here has not been a scintilla of evidence that the defendant children directly participated in the alleged fraud [of Telemachus] or that they had knowledge of the fraud from which liability could be inferred"; (b) there was no evidence to support a finding that Telemachus was acting as an agent of the defendant children when he transferred to them the 400 shares of DSM stock; and (c) there was "no evidence to suggest that the defendant children had a fiduciary relationship with any of the plaintiffs." (This latter determination would appear to mean that there was no such relationship in connection

---

[13]He sold one hundred shares each to himself, the defendant children, and employees James Miamis and Julian Lacourse; eighty shares each to plaintiff children Arthur S. and Evan; and thirty shares each to plaintiff children Diana and Fotene. Each purchaser paid the estate $1,150 per share on January 7, 1977. In 1982, Telemachus sold the remaining 300 shares in George's estate to himself.

with the administration of George's estate.) The judge also concluded that she did not have to decide whether the defendant children were bona fide purchasers of the DSM stock because, as she put the issue, "the plaintiffs have not sustained their claim of fraud against the defendant children." With the defendant children out of the case at this point, the trial proceeded to a conclusion.

After the jury returned their answers to the special questions, finding that Telemachus had acted wrongfully with respect to his duties to Evanthea and the plaintiff children, and had defrauded Evanthea, in connection with the 1977 sales of DSM stock, the defendant children moved, under Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), for the entry of a separate and final judgment, based on the prior grant of the directed verdict in their favor. The plaintiffs opposed the motion, and the parties filed legal memoranda in support of their respective positions. The judge entered a written memorandum of decision which (a) denied the defendant children's motion for the entry of separate and final judgment; (b) vacated the directed verdict in their favor; and (c) concluded, as a matter of law, that the defendant children were not bona fide purchasers of the 400 shares of DSM stock they had acquired. The judge then imposed a constructive trust on the stock for the benefit of the plaintiffs.

In reaching her determinations, the judge noted that her directed verdict order had been predicated on the lack of evidence in the plaintiffs' case that the defendant children had participated in Telemachus's fraud or could otherwise be held liable for his wrongdoing. The judge observed, however, that the plaintiffs' fourth amended complaint had also asserted that the defendant children were not bona fide purchasers of the 400 shares of DSM stock and had sought the imposition of a constructive trust on the stock. The judge perceived that her order allowing the directed verdict had not properly dealt with the plaintiffs' constructive trust claim. The judge then proceeded to look at that claim anew in light of the plaintiffs' assertion that the defendant children were not bona fide purchasers. Based on the jury's answer to one special question (question 6 [h]), in which the jury concluded that Evanthea did not "know" of the 1977 transfers of DSM stock until 1987, the judge concluded that the 1977 transaction which shifted 400 shares of DSM stock to the defendant children was not "voluntary" on Evanthea's part. From this conclusion, the judge went on to

reason that an involuntary sale prevented the defendant children from claiming bona fide purchaser status as a matter of law. Further, the judge decided that Telemachus had been the defendant children's virtual representative at the trial, and, because he "represented" them, they were bound on issue preclusion principles from relitigating any contention that they may have been bona fide purchasers.

The defendant children argue that the judge erred in concluding that they could not be bona fide purchasers. They maintain that they had that status as a matter of law. If we reject this argument (which we shall), they assert that the issue of their status as bona fide purchasers should have been determined at further proceedings.

(a) The judge had general authority to reconsider her order granting the defendant children a directed verdict. See *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 14, cert. denied, 522 U.S. 1015 (1997). She correctly reopened the plaintiffs' constructive trust claim because, in the maelstrom of litigation, the question whether a constructive trust should be imposed on the 400 shares of DSM stock, determined by the jury to have been wrongfully transferred, apparently had been overlooked. The question stood in a peculiar posture because, after the grant of the directed verdict, neither the plaintiffs or the defendant children had offered any evidence on the defendant children's possible status as bona fide purchasers, which was a matter directly relevant to whether a constructive trust should be imposed on the defendant children.

We agree with the judge that, based on the significant wrongdoing committed by Telemachus (as found by the jury), the 400 shares of DSM stock could be made subject to a constructive trust. See *Collins* v. *Guggenheim*, 417 Mass. 615, 618 (1994); *Massachusetts Wholesalers of Malt Beverages, Inc.* v. *Attorney Gen.*, 409 Mass. 336, 342 (1991). This remedy could be imposed on the defendant children unless they established that they were bona fide purchasers. See *Demoulas I, supra* at 546. We disagree with the judge that the record establishes, as a matter of law, that the defendant children were not bona fide purchasers.

The bona fide purchaser question, pertaining to the DSM stock, is appropriately decided under the principles set forth in art. 8 of the Uniform Commercial Code (Code) governing

investment securities.[14] A "bona fide purchaser" is defined therein as "a purchaser for value in good faith and without notice of any adverse claim." G. L. c. 106, § 8-302 (1). A "purchase" is "any . . . voluntary transaction creating an interest in property," including (among other transactions), a sale or issue. G. L. c. 106, § 1-201 (32). The judge determined that the jury's answer to special question 6 (h) (that Evanthea did not "know" of the stock transfer until 1987) conclusively established that Evanthea's role in the transfer was involuntary, as a matter of law. Therefore, she concluded, the transfer was not a "purchase," the defendant children were not "purchasers," and thus they could not be "bona fide purchasers." This determination was in error.

First, special question 6 (h) was posed to the jury for their determination of the approximate date when Evanthea "knew" of the unlawful stock transfer for the purpose of deciding whether the applicable statute of limitations barred her claim. The jury's response simply informed the judge that Evanthea did not have a sufficient awareness of the implications of the transaction, or a perception that she had been wronged, until 1987, and it was at that time that the statute of limitations began to run. One cannot reasonably infer from the jury's response to question 6 (h), in the context of the evidence that led to that answer, that the purchase by the defendant children was the result of an involuntary action.

Second, and more fundamentally, the transfer by Evanthea was "voluntary" in the sense of that term as used in the Code. Evanthea, as coexecutor, voluntarily signed the documents that transferred the stock, but she did so trusting Telemachus, who was subsequently found to have defrauded her (as well as having violated his fiduciary duty to the beneficiaries of the estate and having committed securities fraud) with respect to the transaction. A transfer that is fraudulently induced (even if the

---

[14]All our references to art. 8 of the Code are to G. L. c. 106, §§ 8-101 et seq., as appearing in St. 1983, c. 522, § 5. The defendant children refer to no objection in the record on their behalf that the judge apply the version of the Code in effect at the time some of the causes of action accrued; e.g., the 1977 transfers of the DSM stock. G. L. c. 106, §§ 8-101 et seq., inserted by St. 1957, c. 765, § 1 (in effect January 20, 1977). It appears that all parties acquiesced to the use of the 1983 version of the Code. In *Demoulas I, supra* at 546-547, the shareholder derivative and contempt action, the same judge also applied the 1983 version of art. 8, and her use of that version was not challenged on appeal by any of the defendants.

fraud is such as to impose criminal liability on the person making the misrepresentations) is considered a "purchase" under the Code, and meets the threshold requirement of being "voluntary."[15] Further, it would be anomalous to interpret art. 8 to mean that bona fide purchaser status was unavailable as a matter of law when a transfer was effectuated by fraud induced by a coexecutor (and that therefore it was not "voluntary" and could not be a "purchase"), when bona fide purchaser status is available when a transfer is made in circumstances that might be larcenous. See G. L. c. 106, § 8-302; *Krick* v. *First Nat'l Bank*, 8 Ill. App. 3d 663 (1972) (bona fide purchaser defense available to bank which purchased stolen bonds).

Because the judge's underlying determination — that the transfer of the DSM stock by Evanthea was involuntary — cannot be supported, there is no need to decide the correctness of her application of the concept of virtual representation and of issue preclusion principles to bind the defendant children to Telemachus's wrongdoing. The inquiry then turns to the status of the defendant children as bona fide purchasers — namely,

---

[15]See, e.g., G. L. c. 106 § 2-403 (1) (*d*). That provision deals with the sale of goods. Subsection (1), entitled "Power to Transfer; Good Faith Purchase of Goods; 'Entrusting,' " states: "A person with voidable title has power to transfer good title to a good faith purchaser." Further, paragraph (*d*) states: "When goods have been delivered under a transaction of purchase the purchaser has [the] power [to transfer good title to a good faith purchaser for value] even though the delivery was procured through fraud punishable as larcenous under the criminal law." For cases applying this proposition, see *Evergreen Marine Corp.* v. *Six Consignments of Frozen Scallops*, 806 F. Supp. 291, 297 (D. Mass. 1992), vacated on other grounds, 4 F.3d 90 (1st Cir. 1993) (purchaser has voidable title because of fraudulent representation of solvency to seller); *Landshire Food Serv., Inc.* v. *Coghill*, 709 S.W.2d 509, 512 (Mo. Ct. App. 1986) (purchaser has voidable title because title obtained from owner who, induced by fraudulent representation, voluntarily sold car to purchaser); *Dartmouth Motor Sales, Inc.* v. *Wilcox*, 128 N.H. 526, 528-530 (1986) (same).

See also G. L. c. 106, § 3-302 (1), dealing with commercial paper, and specifically with the definitions of "holders in due course." In the official comments, under "Purposes of Changes and New Matter," commentators describe that a payee (P) who takes an instrument under the following circumstances is a "holder in due course," a concept similar to a bona fide purchaser: "A and B sign a note as co-makers. A induces B to sign by fraud, and without authority from B delivers the note to P, who takes it for value, in good faith and without notice." 2 U.L.A. prior art. 3, § 3-302 official comment 2, at 487-488 (Master ed. 1991). For an application of this description of a holder in due course, see *New Bedford Inst. for Sav.* v. *Gildroy*, 36 Mass. App. Ct. 647, 650-653, 654 (1994) (payee may try to prove it is a holder in due course even though one coowner was induced to sell through fraud).

whether they are "purchaser[s] for value in good faith and without notice of any adverse claim."

(b) We reject the plaintiffs' argument that the defendant children lack bona fide purchaser status as a matter of law. The plaintiffs argue that the record shows indisputably that the defendant children had constructive notice of Telemachus's fraud and violations of fiduciary duty, and thus cannot be bona fide purchasers.[16]

A party claiming bona fide purchaser status bears the burden of persuasion on the issue. See *Demoulas I, supra* at 548. In doing so, the party must convince the finder of fact that he or she undertook the transaction in good faith without notice of adverse claims. The term "[g]ood faith" means "honesty in fact in the conduct or transaction concerned." See G. L. c. 106, § 1-201 (19). A party must show that he or she had a subjective honest belief in the legitimacy of the transaction. See *Demoulas I, supra* at 547, and cases cited.

"A person has 'notice' of a fact when (*a*) he has actual knowledge of it; or (*b*) he has received a notice or notification of it, or (*c*) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it. 'Discover' or 'learn' or a word or phrase of similar import refers to knowledge rather than to reason to know." G. L. c. 106, § 1-201 (25). In some instances, notice is

---

[16]The plaintiffs also argue that the children waived the bona fide purchaser argument. We disagree. In their fourth amended complaint, the plaintiffs asserted that none of the defendant children "took possession or title to the shares transferred out of George's estate in 1977 as bona fide purchasers for value." The defendant children filed an answer denying that claim, but did not affirmatively plead that they were bona fide purchasers.

Rule 8 (c) of the Massachusetts Rules of Civil Procedure, 365 Mass. 749 (1974), states that parties must plead their affirmative defenses in their answer. The defendant children's denial is not in strict compliance with that rule. It is true that, generally, a failure to plead an affirmative defense results in a waiver and exclusion of the defense from the case. See *Anthony's Pier Four, Inc.* v. *HBC Assoc.*, 411 Mass. 451, 471 (1991). However, the purpose of rule 8 (c) is to provide notice to the plaintiffs of defenses that will be raised. There is no question that the plaintiffs were on notice that a bona fide purchaser defense would be raised, because they asserted that the defendant children lacked that status from the start. In addition, the issue was raised by both parties in briefs and at a hearing in connection with the defendant children's motion for a directed verdict. See *Bendetson* v. *Building Inspector of Revere*, 36 Mass. App. Ct. 615, 620 n.9 (1994).

measured by an objective standard, as a matter of law, because if a person has actual notice of some facts or circumstances, a court may find an objective reason to know another fact. When examining transfers of stock, mere notice that one is dealing with a fiduciary does not create a duty of inquiry. However, knowledge that the transaction is for the individual benefit of the fiduciary, or is in violation of fiduciary duty, will charge the purchaser with notice of adverse claims. G. L. c. 106, § 8-304 (3). See *Michelin Tires (Can.) Ltd.* v. *First Nat'l Bank,* 666 F.2d 673, 682 (1st Cir. 1981).

"Adverse claim" is defined as "a claim that a transfer was or would be unauthorized or wrongful or that a particular adverse person is the owner of or has an interest in the security." G. L. c. 106, § 8-302 (2). The definition applies to a claim by a beneficial owner that a security has been, or is proposed to be transferred in breach of trust. 2C U.L.A. § 8-302 (2) official comment no. 4 at 357 (Master ed. 1991).

It is obvious from these principles that a claim of bona fide purchaser status can be negated if the purchaser has an awareness, short of actual knowledge, of an adverse claim. The plaintiffs point to excerpts of deposition testimony that were not in evidence at the trial to support their assertions that the defendant children knew that their stock acquisitions would shift the majority ownership in DSM to their family, benefiting Telemachus and their side of the family, and thereby putting them on notice of an adverse claim. These assertions have not been fully established. An application of the principles stated above requires a hearing.

(c) We similarly reject the defendant children's argument that the record establishes that they have bona fide purchaser status as a matter of law.

The plaintiffs' failure of proof in their case-in-chief against the defendant children established only that the latter did not directly know of, or participate in, Telemachus's fraud, were not bound to his fraud on agency principles, and that they owed no fiduciary duties to the plaintiffs arising out of the administration of George's estate. There was some evidence at the trial that the defendant children had paid money for the stock. These determinations alone, however, do not make the defendant children bona fide purchasers. Having previously decided that the record also does not resolve the issues in favor of the plaintiffs, it follows that there must be further inquiry on

whether the defendant children were bona fide purchasers of the DSM stock.

In applying the standards set forth above, certain factors may be considered in determining whether the defendant children have established that they were bona fide purchasers.[17] First, it is to be kept uppermost in mind that the jury have found Telemachus liable for massive wrongdoing and that the defendant children have been, and are, closely connected to him. The defendant children had reason to know of his role in DSM, the manner in which he conducted the company, and his role as coexecutor and cotrustee in administering George's estate.[18] They cannot establish themselves as bona fide purchasers simply by claiming that they were "blissfully unaware" of what their father might have been doing. "If a person confronted with a state of facts closes his eyes in order that he may not see that which would be visible and therefore known to him if he looked, he is chargeable with 'knowledge' of what he would have seen had he looked." *West's Case*, 313 Mass. 146, 151 (1943), quoting *Zdunek* v. *Thomas*, 215 Mass. 11, 15 (1934). See *Nycal Corp.* v. *KPMG Peat Marwick LLP.*, 426 Mass. 491, 498-499 (1998); *Van Christo Advertising, Inc.* v. *M/A-COM/LCS*, 426 Mass. 410, 417 (1998) (claim of wilful ignorance of information will not be excused if information could have been known had the person simply not consciously disregarded it).

Second, it is pertinent to consider what has been found, and affirmed, in *Demoulas I*, as to similar bona fide purchaser claims made by the defendant children in connection with numerous wrongful transactions involving DSM and several other entities from which they benefited. In *Demoulas I*, it was decided that the defendant children had not acted in good faith in acquiring the disputed interests; that they should have been aware of adverse claims that affected those interests; that they were

---

[17]The plaintiffs appear to have assumed the burden of proof by asserting that the defendant children were not bona fide purchasers in their fourth amended complaint. As we articulated in *Demoulas I, supra* at 548, this is not the proper method for asserting this status. Once a defect in a purchase is identified, such as in this case, with Telemachus's wrongdoing regarding the sale of the 400 shares of DSM stock, the defendant children, to whom the stock was sold, must establish that they are bona fide purchasers in order to protect their purchase.

[18]Arthur T. was a director of Valley Properties, Inc., when the DSM stock was transferred. He became a corporate fiduciary of DSM in 1978. See *Demoulas I, supra* at 533, 537 n.42.

knowledgeable about the fiduciary duties owed by corporate officers and directors when they made their acquisitions; and that, even if some of them may have paid value to purchase their interests, that fact alone would not shield them from the imposition of a constructive trust to prevent unjust enrichment. See *Demoulas I, supra* at 549-555. The defendant children's acquisition of their DSM stock was, of course, a transaction that was separate from those analyzed in *Demoulas I*. Nonetheless, all the latter transactions share with the transfer of the 400 shares of DSM stock the common connection of advancing the interests of Telemachus and his family, to the detriment of the plaintiffs.

Thirdly, the transfer of the DSM stock to the defendant children has been found to be in furtherance of Telemachus's plan to create a "control group" to operate DSM which consisted principally of himself and his family. We think the well-established standards that govern the relationship between shareholders in a close corporation should be applied, at least by analogy, in evaluating the persuasiveness of the defendant children's claim that they were bona fide purchasers. See *Donahue* v. *Rodd Electrotype Co. of New England*, 367 Mass. 578, 592-593 & n.18 (1975). These standards were stated in the following terms in *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 408 (1995), citing *id.* at 593: "Because of the relationship [of trust, confidence, and absolute loyalty], stockholders in a close corporation owe one another the same fiduciary duty in the operation of the corporation that partners owe to one another. This fiduciary duty is one of the utmost good faith and loyalty . . . . Stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency, or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." Whether the defendant children acted in strict conformity with these duties is therefore a pertinent consideration because some of them have stated that they knew their acquisition of DSM stock would alter the preexisting equal relationship between the families in the control of DSM's operations.[19]

It appears that the defendant children could have a difficult

---

[19]The parties in their briefs argue only the bona fide purchaser issue in the terms discussed above. Our remand of this issue to the trial court to conduct further proceedings should not be viewed as limiting the plaintiffs from seeking the imposition of a constructive trust on the defendant children's stock on

task in proving their claim. The judge has discretion to determine the scope and duration of any evidentiary hearing. If the shares in question are made subject to a constructive trust, that remedy should not require repayment of more than actual net gains attributable to the stock wrongly acquired.

5. As part of the remedy ordered for the plaintiffs as a result of Telemachus's wrongdoing, the judge reformed Delta & Delta, a family entity, by transferring interests in the entity from the defendant children to Evanthea and the defendant children's mother, Irene. The defendant children argue that the relief ordered by the judge should be set aside because (a) they did not purchase these interests from the plaintiffs or from George's estate; (b) they were not implicated in any transaction relating to Delta & Delta; and (c) they were denied due process because they never knew these interests were in issue at the trial, and they were never afforded the opportunity to present a defense before reformation was ordered. We agree that the defendant children should be given the opportunity to prove their status as bona fide purchasers of the Delta & Delta interests. The background necessary to resolution of the issues is as follows.

Delta & Delta was formed as a real estate trust on August 18, 1971, shortly after George's death on June 27 of that year. Telemachus was named as the sole trustee, and was authorized, among other powers, to purchase, develop and lease real estate. The initial beneficiaries of the trust were Telemachus; his wife, Irene; the defendant children; Evanthea; the plaintiff children; and Telemachus's brother-in-law, Costas Psoinos. Telemachus and his family owned a 50% interest, George's family owned a 40% interest, and Psoinos owned a 10% interest. Telemachus, beginning in 1976, transferred into Delta & Delta real estate that had formerly been owned equally by the two families.

In 1973, Evanthea sold Telemachus a 5% share in her interest in Delta & Delta for $48. The jury found the actual value of the interest to be $51,000. In 1976, she sold a 3% interest to Psoinos for $30,000 (the jury found the actual value of this interest to be $104,565), and she sold her remaining 2% interest in the trust to her daughters for $20,000.

In 1984, Telemachus caused the beneficiaries of the trust to memorialize the fact that the trust had been operating as a

---

any other equitable ground or grounds that are shown to apply, including any ground that might warrant equitable relief even if the defendant children can establish some standing as bona fide purchasers.

partnership, and to execute a document known as the Delta & Delta Realty Confirmatory Partnership Agreement. This action appears to have organized the trust in a way that allowed the beneficiaries to claim the tax benefits of a partnership.

The jury found that Telemachus had violated his fiduciary duty to Evanthea when he formed Delta & Delta, which altered the long-standing arrangement of each side of the family owning an equal interest in real estate. Further, they found that he had violated his fiduciary duty to, and had defrauded, Evanthea in transferring her 5% interest in Delta & Delta to himself and her 3% interest to Psoinos. The jury's findings express their conclusion that Telemachus engaged in a calculated scheme by forming Delta & Delta and by arranging the transfer of interests to benefit his family and, that, in so doing, he had divested the plaintiffs of interests which would have kept the ownership of real estate at parity, as it had been before George died. Telemachus thus engaged in wrongful self-dealing, violating both the trust he owed as a cofiduciary in George's estate and as the sole trustee of Delta & Delta.

Based on these findings, the judge rescinded these transfers and ordered the reformation of the interests in Delta & Delta to reflect the approximate coequal position George's family had in the family entities at the time of George's death. To accomplish this, the judge ordered the divestment of Telemachus's 10% interest and the transfer of that interest to Evanthea. She additionally ordered the divestment of a 1% interest from each of the defendant children, and the transfer of 3% of those divested interests to Evanthea, and the transfer of the remaining 1% interest to Irene, the defendant children's mother.[20]

Equitable remedies are flexible tools to be applied with the focus on fairness and justice. 1 D. Dobbs, Remedies § 2.1(3), at 63 (2d ed. 1993). A court has the power to grant equitable relief when there has been a violation of fiduciary duty and fraud, and rescission may be ordered to avoid unjust enrichment

---

[20]The judge divested and distributed only full percentage interests of Delta & Delta. She distributed a 1% interest to Irene apparently to accomplish the goal of equalizing the two family sides without giving a disproportionate interest to one of the defendant children or giving any interest to Telemachus.

After the transfers ordered by the judge, the defendant children and Irene have a 55% interest in Delta & Delta, and the plaintiff children and Evanthea have a 45% interest. The inequality is a result of the sales of what was originally Costas Psoinos's 10% interest to the defendant children. The transactions with Psoinos have not been disputed by the plaintiffs.

of the fiduciary at the expense of a beneficiary. See *Broomfield* v. *Kosow*, 349 Mass. 749, 758 (1965); *Jose* v. *Lyman*, 316 Mass. 271, 278 (1944). A court may also reform an agreement to correct wrongdoing. See *Elias Bros. Restaurants* v. *Acorn Enters., Inc.*, 831 F. Supp. 920, 927 (D. Mass. 1993). See also *Beaton* v. *Land Court*, 367 Mass. 385, 392, appeal dismissed, 423 U.S. 806 (1975); *Century Plastic Corp.* v. *Tupper Corp.*, 333 Mass. 531, 533 (1956); *Brodie* v. *Evirs*, 313 Mass. 741, 744, (1943); *Barrell* v. *Britton*, 252 Mass. 504, 508 (1925); *Torrao* v. *Cox*, 26 Mass. App. Ct. 247 (1988).

Rescission is appropriate where property has not been sold to a bona fide purchaser, and the wrongdoer still holds the property at the time of trial. See *Barshak* v. *Buccheri*, 406 Mass. 187, 192-193 (1989). Where a fiduciary, in violation of his duty to the beneficiary, causes property to be transferred to a third person, the third person, if he had notice of the violation of duty, holds the property upon a constructive trust for the beneficiary. Restatement of Restitution § 201 (1937). If the third person, in acquiring the property, gave value, and was without notice of the violation of fiduciary duty, he may be entitled to the status of bona fide purchaser and thus take the property free of the claims of the beneficiary. Restatement of Restitution, *supra* at § 172. These principles apply as well where the equitable remedy of reformation is ordered.

The interests in Delta & Delta are not considered under art. 8, because they are not "securities" as defined by the Code.[21] However, as noted above, at common law, a bona fide purchaser

---

[21]See G. L. c. 106, § 8-102 (1) (*a*), as appearing in St. 1963, c. 188, § 14, which defines a "security," in part, as an instrument issued in bearer or registered form, that is commonly traded at securities exchanges or markets.

General partnership interests are not commonly exchanged in the securities markets. Partnership interests are governed by contract rights. "One of the key differences of th[e] distinction [between securities under art. 8 and partnership interests] concerns transfer of the two kinds of property interest. While the rules for transfer of securities is governed by Article 8, transfer of a . . . partnership interest is often governed, as it is in this case, by the partnership agreement itself. . . . Securities, on the other hand, can usually be transferred by endorsement of the owner or holder, without the consent of the issuer of the security." *Motobecane America, Ltd.* v. *Patrick Petroleum Co.*, 600 F. Supp. 1419, 1424 (E.D. Mich. 1985).

The "Confirmatory Partnership Agreement" executed on February 29, 1984, states that the holders of the beneficial interests in Delta & Delta "have been operating for some time as a de facto partnership," and declares that the term of the partnership "shall commence on August 18, 1971." The agree-

defense is also available to transferees of property outside art. 8.[22]

A similar problem exists with regard to the passing of the Delta & Delta interests to the children in 1971, when the realty trust was formed, as pertained to the transfer of the DSM stock to the children in 1977. The jury found considerable wrongdoing on the part of Telemachus with respect to Delta & Delta, but did not address the issue whether the defendant children were aware of Telemachus's wrongdoing. As has been mentioned, the only facts flowing from the directed verdict are that the defendant children had no actual knowledge of, and did not directly participate in, Telemachus's violation of fiduciary duty and fraud on Evanthea in connection with the administration of George's estate.

There is no merit to the defendant children's argument that, because they did not purchase their beneficial or partnership interests from George's estate or from the plaintiffs, the plaintiffs are not entitled to receive these assets. Telemachus's wrongdoing dates from 1971, when Delta & Delta was created just after George's death. The remedy ordered by the judge was meant to rectify the improper formation of Delta & Delta with disproportionate interests between George's and Telemachus's families, into which Telemachus subsequently, and wrongfully, placed assets in which the families formerly had equal interests.

However, because no evidence was presented implicating the defendant children in any wrongdoing involving Delta & Delta, the judge should not have imposed a remedy reaching their assets without an inquiry on whether they were bona fide purchasers. The defendant children did not purchase the assets from the estate or from the plaintiffs, but the manner in which they obtained the assets is relevant. According to Telemachus, when he formed Delta & Delta in 1971, he alone put money into the trust. If the defendant children received the disproportionate as-

---

ment reduces to writing the terms of that partnership. It limits the assignment of interests unless all other partners consent, and restricts the addition of other partners absent agreement of 80% of the remaining partnership interests.

[22]In *Demoulas I, supra* at 546, we undertook an analysis, under art. 8, of the potential bona fide purchaser status of some Demoulas family members in interests in a number of family entities not at issue here. Included in the analysis were partnership interests in 231 Realty Associates. While we here recognize that partnership interests are outside the scope of art. 8, the bona fide purchaser concepts under art. 8 are analogous to those in the common law. These concepts were properly applied in that case.

sets by gift, the bona fide purchaser status is not available to them. See *Demoulas I, supra* at 547; Restatement of Restitution, *supra* at § 173 comment b, at 697. If they purchased the assets, they should have the opportunity to establish their status as bona fide purchasers. As is the case with the defendant children's DSM stock and subject to the factors already discussed (as may be applicable), a hearing is necessary as to their potential status as bona fide purchasers for value of the Delta & Delta interests.

If it is determined that the defendant children were not bona fide purchasers of the Delta & Delta interests received in 1971, then correction of the agreement to reflect the original equal ownership between the families is appropriate, not taking into consideration the defendant children's purchase of Psoinos's interest. In this regard, having already divested Telemachus of his 10% interest and having reallocated that interest to Evanthea, George's side of the family will need only 3% more to reach the goal of 45% ownership. The judge must determine how the divestment and allocation of the defendant children's interests should be made, giving consideration, if appropriate, to the divestment or allocation of less than a 1% interest.

### Appeal of DSM.

6. The January 20, 1977, transfer of 920 shares of DSM stock from George's estate included, in addition to the 400 shares transferred to the defendant children which was the subject of their appeal, 200 shares that were transferred to two employees of DSM, James Miamis and Julian Lacourse (one hundred shares each, see note 13, *supra*). The jury found with respect to this transfer that Telemachus (a) had violated his fiduciary duty to Evanthea and defrauded her when he made the transfer; and (b) had, at the same time, and in the same respect, violated his fiduciary duty to the plaintiff children. DSM subsequently redeemed 150 of the 200 shares from Miamis and Lacourse.[23] The judge denied DSM's motion under Mass. R. Civ. P. 54 (b) for the entry of separate and final judgment as to the transfer of these 150 shares (and other DSM shares as well), and ordered the transfer rescinded and the shares returned to the plaintiffs. DSM argues that it is a bona fide purchaser of the

---

[23]Telemachus exercised an option to purchase the remaining fifty shares on April 1, 1987.

150 shares redeemed from Miamis and Lacourse because the two employees were bona fide purchasers from George's estate. As a consequence, DSM reasons, under the so-called "shelter" provision of the Code, G. L. c. 106, § 8-301 (1),[24] DSM is entitled to the bona fide purchaser status enjoyed by Miamis and Lacourse. We reject the argument.

The judge stated several reasons for concluding that DSM could not prevail as a bona fide purchaser as to these 150 shares. Among those reasons was her conclusion that DSM was on notice of an adverse claim because the wrongdoing of Telemachus was imputed to, and binding on, it. In this respect, the judge determined, based on the jury's answers to special questions, that "Telemachus alone controlled and directed the Demoulas family empire. Telemachus alone made all of the decisions involving the financial interests of the [p]laintiffs and his family, and . . . he alone arranged for all of the transactions involved in this case." We agree with the conclusions and reasoning of the judge, and, as a result, we need not consider the other grounds on which she relied to rescind the transfer.

DSM does not dispute that Telemachus was acting on its behalf when the stock was redeemed by him for DSM's benefit. The jury's answers establish conclusively that Telemachus, because of his wrongdoing, had notice of the plaintiffs' adverse claim. DSM argues that Telemachus' knowledge cannot be imputed to it because he was not acting on DSM's behalf when he wrongfully transferred the 150 shares out of George's estate.

"The general rule . . . is that the knowledge of an officer of the corporation obtained while acting outside the scope of his official duties, in relation to a matter in which he acted for himself and not for the corporation, is not, merely because of his office, to be imputed to the corporation." *Phoenix Sav. & Loan, Inc.* v. *Aetna Cas. & Sur. Co.*, 427 F.2d 862 (4th Cir. 1970), quoting *William Danzer & Co.* v. *Western Md. Ry.*, 164 Md. 448, 457 (1933). However, "knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation." *Phoenix Sav. & Loan, Inc.* v. *Aetna Cas. & Sur. Co.*, 381 F.2d 245, 250 (4th Cir. 1967),

---

[24]General Laws c. 106, § 8-301 (1), as appearing in St. 1983, c. 522, § 5, states: "Upon transfer of a security to a purchaser . . . the purchaser acquires the rights in the security which his transferor had or had actual authority to convey unless the purchaser's rights are limited by subsection (4) of section 8-302."

remanded, 302 F. Supp. 832 (D. Md. 1969), rev'd on other grounds, 427 F.2d 862 (4th Cir. 1970). See Fletcher, Cyclopedia of Corporations § 826 (rev. ed. 1994) (general rule of not imputing knowledge to corporation not applicable where "board of directors has . . . complete control and direction of all of the business and affairs of the institution, and the president has habitually exercised the same"). When " 'all corporate power is exercised by a few who perform misdeeds, knowledge of those misdeeds must be imputed to the corporation.' " *Phoenix Sav. & Loan, Inc.* v. *Aetna Cas. & Sur. Co.*, 302 F. Supp. 832, 840 (D. Md. 1969). See *Jefferson Park Realty Corp.* v. *Ridgely*, 99 Ind. App. 146, 164 (1934), quoting Thompson, Corporations § 1777 (3d ed. 1927) ("if [an agent] is the sole representative in the transaction, and is in effect the alter ego, notice to him is imputable to the [corporation]").

Early during the trial, the plaintiffs sought to introduce evidence to show that Telemachus was able to commit his wrongful acts based on his "extraordinary control over [DSM]." Counsel for the defendants (including DSM) objected to the evidence and responded, "[W]e have conceded control. I said at the beginning, [Telemachus] is the sole voting trustee of 100 percent of the stock. We have never denied control." Counsel for the defendants later reiterated this position, when he objected to the plaintiffs' introduction of expert testimony showing that Telemachus's exercise of control over DSM did not comport with good "corporate governance." Counsel for the defendants stated, "control is not an issue in this case. I mean, Telemachus Demoulas certainly had control of all these corporations [DSM among them], he was the sole voting trustee, he was the sole voting trustee both before and after he acquired any of the shares." The exchange noted in the margin[25] concerned the defendants' objections to similar testimony, and the exchange further supports the conclusion that Telemachus exercised dominance over DSM.

---

[25]PLAINTIFFS' COUNSEL: "The question goes directly to control of the corporation. What Telemachus Demoulas has here, he's got a board of directors, and we will argue in closing, he's got a board of directors that is a rubber stamp board of directors that does whatever he wants them to do; that he completely controls the corporation that he can get them to do anything. . . . If he comes in with a resolution and lays it in front of them, they vote on it. And that is completely relevant to the question of control of this corporation."

DEFENDANTS' COUNSEL: "We've never denied that he controlled it. He was the sole voting trustee."

In view of this conclusion, DSM cannot improve its position by arguing that it purchased the stock from bona fide purchasers. Even if we were to assume Miamis and Lacourse were bona fide purchasers (an assumption which may be dubious), DSM could not obtain status as a bona fide purchaser based on the shelter rule. Although the shelter rule, stated in § 8-301 (1), permits a party to acquire the rights held by his transferor, G. L. c. 106, § 8-302 (4), limits the rights that can be acquired when it provides:

> "Notwithstanding subsection (1) of section 8-301, the transferee of a particular certified security who has been a party to any fraud or illegality affecting the security, or who as a prior holder of that certified security had notice of an adverse claim, cannot improve his position by taking from a bona fide purchaser."

As we have previously decided, Telemachus's knowledge of the plaintiffs' adverse claims is imputed to DSM. While Telemachus was not strictly acting on behalf of DSM when he wrongfully transferred the DSM stock from George's estate, he was in control of DSM at the time, and he caused DSM to waive restrictions on transfer so that the shares could be sold. Telemachus also acted in his capacity as a DSM director when he allowed the restrictions on transfer of DSM stock to be waived so that he could accomplish the wrongful transfers from George's estate. DSM cannot take refuge from the fact that, while Telemachus was in the process of defrauding Evanthea, he was wearing his executor "hat," rather than his DSM "hat." Telemachus, acting in a way that bound DSM, committed wrongdoing in connection with the transfers of DSM stock when he allowed DSM to waive restrictions on transfer of the stock with full knowledge that the sole reason for the waiver was to facilitate an independent fraud. His self-dealing proceeded in an orderly, planned progression, to defraud George's estate and to benefit DSM in a way which wrongfully enriched his family and his interests. The shelter rule is not available to DSM.

7. We next address DSM's arguments relating to the relief ordered by the judge.[26]

The plaintiffs' fourth amended complaint sought both legal

---

[26]We have addressed portions of the judge's order for equitable relief in conjunction with the defendant children's appeal. Our present discussion

and equitable relief. Before the commencement of the trial, the judge, pursuant to a proposal submitted by the plaintiffs, separated the issues of liability and damages, thus bifurcating the trial. After the trial of the liability issues, the jury's answers to special questions determined extensive wrongdoing on the part of Telemachus, but found no liability on the plaintiffs' claims which were the basis of their request for purely legal relief. In view of the jury's responses, the plaintiffs filed a motion requesting only equitable relief and the entry of a separate and final judgment, pursuant to Mass. R. Civ. P. 54 (b). The defendants opposed this motion with memoranda of law arguing against the equitable remedies sought by the plaintiffs. In addition, the defendants moved for an evidentiary hearing on issues relevant to equitable relief, maintaining that such a hearing was necessary in order to establish facts that would help fashion the relief.[27] The judge heard arguments on the motions, and subsequently requested that the parties submit memoranda discussing remedies and offering arguments about the appropriateness of rescission, rescissory damages, and the reconfiguration of various family entities. The plaintiffs complied with this request; the defendants' memoranda (by this point DSM, Telemachus, and the defendant children were separately represented) repeated their arguments that an evidentiary hearing was necessary.

After consideration of the record created by the parties on the issue of relief, the judge imposed a constructive trust on DSM and ordered that 1150 shares of its treasury stock be transferred to the plaintiff children and to the George A. Demoulas Trust (created by George's estate).[28] Additionally, the judge ordered relief in the form of rescission, requiring Telemachus and the defendant children to transfer DSM stock to the plaintiffs in

focuses on the arguments raised by DSM that the relief ordered against it was improper.

[27]Specifically, the defendants argued that a hearing was necessary "to enable the Court to determine: (1) the amount of taxes that the individual defendants paid on [the] Subchapter S distributions that they received from DSM on account of those shares of DSM [stock] formerly owned by plaintiffs or by the Estate of George A. Demoulas; (2) what effect rescission would have on the future operations of DSM; and (3) the amount of money which plaintiffs received in connection with their sales of shares of DSM."

[28]In view of the jury's findings, the judge imposed on DSM a constructive trust on the 150 shares redeemed in 1985 from Miamis and Lacourse and on

varying amounts. The result of these transfers caused the plaintiffs' family to hold a majority of stock in DSM and rendered Telemachus's family the minority interest.[29] The judge also ordered and prescribed (among other relief), the restructuring of DSM's board of directors, amendments to its articles of incorporation and by-laws, a method for electing new officers, an independent audit, and outside monitoring of the company's daily operations.

DSM argues that the judge's award of equitable relief without an evidentiary hearing violated its due process rights. Specifically, DSM maintains that (a) the judge misinterpreted the jury's findings and violated the pretrial agreement that all factual issues would be determined by a jury; and (b) an evidentiary hearing was required on all issues pertaining to relief. We disagree.

(a) DSM contends first that the jury's findings do not support the conclusion reached by the judge that the sales by the plaintiffs were not voluntary, and that if, in fact, the sales were voluntary, the remedy of rescission is unavailable in the circumstances. The contention is unpersuasive. First, as we have previously discussed, even if the judge erroneously determined that the sales were "involuntary" under the Code, this determination does not negate the jury's specific finding that the sales were made in breach of Telemachus's fiduciary duty to the plaintiffs.[30] Second, rescission is clearly an appropriate remedy when assets are wrongfully appropriated by a fiduciary. See *Coggins* v. *New England Patriots Football Club, Inc.*, 397 Mass. 525, 530, 535-536 (1986). DSM argues that the *Coggins* case stands for the proposition that, if the plaintiffs sold their shares voluntarily, money damages would be the only remedy available. This is incorrect. In the *Coggins* case, the plaintiffs were harmed by an illegal freeze-out, and the transfer of shares was

1,000 shares redeemed in 1985 and 1986 from the plaintiff children.

The judge ordered the distribution as follows: 225 shares to Diana, 225 shares to Fotene, 425 shares to Rafaele, 125 shares to Arthur S., and 150 shares to the George A. Demoulas Trust.

[29]After the transfers, the plaintiffs will hold 2,500 shares of DSM stock, and Telemachus' family 2,450 shares.

[30]See note 23, *supra*, and accompanying text for our discussion of evidence relevant to the jury's findings of fraud that are pertinent to the transactions at issue here.

involuntary. *Id.* at 530.[31] The *Coggins* case does not limit rescission solely to involuntary transactions. Thus, there is no link between the judge's application of the jury's findings to conclude that the transfers were involuntary, and the appropriateness of the remedy the judge imposed. There is also no "factual gap" that was improperly filled by the judge, and no unfair or erroneous application by her of the jury's findings which spelled out a substantial case of wrongdoing which was more than appropriate for redress by equitable remedies.

(b) We discern no error in the judge's decision to grant the plaintiffs' motion for entry of separate and final judgment. We examine the judge's imposition of equitable remedies under an abuse of discretion standard. See *Bodio* v. *Ellis*, 401 Mass. 1, 10 (1987); *EEOC* v. *Steamship Clerks Union, Local 1066*, 48 F.3d 594, 608 (1st Cir.), cert. denied, 516 U.S. 814 (1995). Notwithstanding the pretrial order bifurcating the issues of liability and damages, the judge acted within her discretion in concluding that the interests of justice would best be served by granting the plaintiffs' motion rather than by holding another lengthy trial.

We reject DSM's further argument that the lack of an evidentiary hearing on relief violated fundamental notions of fairness. Before granting equitable relief, due process requires actual notice to all the parties that the judge is contemplating remedial action and a meaningful opportunity to be heard. See *Steamship Clerks Union, Local 1066, supra* at 608-609. See also *Daniels* v. *Board of Registration in Medicine*, 418 Mass. 380, 383 (1994). Due process does not require any particular type of hearing, and "many matters can lawfully — and satisfactorily — be heard on the papers." *Steamship Clerks Union Local 1066, supra* at 608, citing *Aoude* v. *Mobil Oil Corp.*, 862 F.2d 890, 894 (1st Cir. 1988); *Cia. Petrolera Caribe, Inc.* v. *Arco Caribbean, Inc.*, 754 F.2d 404, 411 (1st Cir. 1985). The judge informed the parties of the need for detailed proposals to assist her in determining the most efficacious form of remedy. The defendants answered with repeated requests for evidentiary

---

[31]The court in that case specifically stated that in cases of illegal and fraudulent conduct by a fiduciary in a closely held corporation, rescission should be the appropriate remedy. See *Coggins* v. *New England Patriots Football Club, Inc.*, 397 Mass. 525, 530, 535 (1986). Money damages were ordered in that case because of the time lapse of nearly ten years, and of the detrimental reliance on the illegal transaction by other innocent stockholders. See *id.*

hearings, and furnished the judge with neither arguments in favor of their preferred remedies nor counterarguments to the remedies proposed by the plaintiffs. We would be hard pressed to detect any unfairness in the manner in which the issue of relief was handled in view of the defendants' failure to provide requested information or to assist the judge in any meaningful way.[32]

We further conclude that DSM has failed to demonstrate that the judge's relief violates governing principles. We recognize, as does DSM, that equitable principles are applied to return an aggrieved party to the status quo. DSM concedes that equal ownership between the two families preserves the status quo. Nonetheless, DSM argues that the judge's order creates a windfall to the plaintiffs because after rescission and transfer, the plaintiffs will obtain majority control of the corporation in violation of the preexisting state of parity.

The "windfall" DSM complains of is grounded on the fact that Telemachus's family obtained control of DSM as a direct result of Telemachus's fraud and wrongdoing. It is more than appropriate to require Telemachus to disgorge benefits wrongfully obtained, as well as to return the plaintiffs to status quo. See *Coggins* v. *New England Patriots Football Club, Inc., supra* at 536; *Sher* v. *Sandler*, 325 Mass. 348, 355-356 (1950). The fact that Telemachus, in a separate and unrelated transaction, gave some of his shares to the Demoulas Foundation, which will now leave his family with a minority interest, is irrelevant to the grant of proper relief. DSM decries the perceived inequity of the result by focusing on the fact that Telemachus has not been returned to status quo by the judge's action, pointing to cases where remedies include a return to defendants of plaintiffs' excess benefits by way of an accounting. See *Demoulas I, supra* at 557; *Lang* v. *Giraudo*, 311 Mass. 132, 139 (1942). Here, the plaintiffs will not "benefit" by any actions undertaken by them, but purely by actions taken independently and voluntarily by Telemachus.

DSM also argues that the judge abused her discretion in

---

[32]DSM has no right to insist on a hearing. "[O]ne must bear in mind that litigants have no absolute right to present their arguments in whatever way they may prefer. . . . The inmates do not run the asylum. . . . The trial judge has broad authority to place reasonable limits on the parties' presentation of their positions." *EEOC* v. *Steamship Clerks Union, Local 1066*, 48 F.3d 594, 609 (1st Cir.), cert. denied, 516 U.S. 814 (1995).

awarding equitable relief that essentially restructured DSM's corporate makeup. The judge had broad powers to determine the appropriate relief "to remedy the wrong complained of and to make the [judgment] effective." *Bodio* v. *Ellis*, *supra*. It is true that courts ordinarily will not get involved in matters of corporate governance. This general principle, however, does not undermine a court's ability to fashion a remedy for closely-held corporations. See *id.*, quoting *Hallahan* v. *Haltom Corp.*, 7 Mass. App. Ct. 68, 71 (1979) (concluding judge's order properly "restored the balance of control among the [plaintiffs] and the [defendants] which . . . the parties had envisioned and which they had a fiduciary duty to each other to maintain"). The judge had discretion (and a basis in the record) to impose a remedy that balanced DSM's governance structure in a way to prevent the future occurrence of the type of wrongdoing found by the jury.

Finally, we need not consider DSM's arguments that non-party DSM shareholders, Irene Demoulas, and the Telemachus A. Demoulas Family Trust, should be given a credit for taxes paid on DSM's accumulated earnings that are in excess of the percentage ownership now attributable to their shares. The judge did not have jurisdiction over nonparties, and we cannot make awards in favor of nonparties. See *D'Errico* v. *Assessors of Woburn*, 384 Mass. 301, 305 (1981). Irene and the Telemachus A. Demoulas Family Trust may or may not have a cause of action against DSM or Telemachus as a result of overpayment of taxes.

## DISPOSITION.

8. The portions of the second amended judgment imposing a constructive trust on the 400 shares of DSM stock held by the defendant children and reforming Delta & Delta to reallocate the 4% interest held by the defendant children therein, and granting any other relief pertaining to these transactions, are vacated. There are to be further proceedings, in accordance with this opinion on the question whether the children are bona fide purchasers of the stock and their respective interests in Delta & Delta, after which an appropriate supplemental judgment is to be entered. In connection with the supplemental judgment, the judge may also make any other adjustments in the relief otherwise granted in the second amended judgment to reflect other matters which in fairness ought to be addressed or modi-

Demoulas *v.* Demoulas.

fied as a result of the evidentiary hearing. The second amended judgment awarding relief against Telemachus and DSM is affirmed.

*So ordered.*